# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 28 2017, 6:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
K.S. (MOTHER)

Robert H. Bellinger II
The Bellinger Law Office
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT
D.S. (FATHER)

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: | June 28, 2017 |
| A.S., E.S., and N.S. (Minor Children), and | Court of Appeals Case No. 02A05-1701-JT-168 |
| K.S. (Mother) and D.S. (Father), | Appeal from the Allen Superior Court |
| *Appellants-Respondents,* | The Honorable Charles F. Pratt, Judge |
| v. | Trial Court Cause No. 02D08-1602-JT-46 02D08-1602-JT-47 02D08-1602-JT-48 |

The Indiana Department of
Child Services,

*Appellee-Petitioner*

**Vaidik, Chief Judge.**

# Case Summary

The Department of Child Services (DCS) removed K.L.S.'s ("Mother") and D.L.S.'s ("Father") children from them because their home was filthy and their children were not fed. The children were then adjudicated children in need of services (CHINS). More than two years later, when the parents had neither benefitted from services nor progressed past therapeutic visits with the children, the State sought to terminate Mother's and Father's parental rights. Mother and Father now separately appeal the termination of their parental rights, arguing that the evidence is insufficient. Finding the evidence sufficient, we affirm.

# Facts and Procedural History

Mother and Father are the parents of A.K.S., born March 7, 2003, E.T.S., born December 7, 2004, and N.J.S., born July 21, 2006. The children have special

needs, especially E.T.S., whose needs are "significant." Tr. Vol. I. p. 129. E.T.S. is diagnosed with encopresis, which is the soiling of underwear with stool by children past the age of toilet training, ADHD, and autism.

[3] DCS became involved in this case in December 2013 when they were called to the family's Fort Wayne house because of the family's living environment. Specifically, the house was in a "deplorable" condition; it was "filthy" with trash everywhere and no food. *Id.* at 13. The children were dirty, hungry, and had lice, and there were bed bugs in the house. DCS removed the children from Mother and Father and placed them in foster care. The children have not been returned to their parents since this time.

[4] In January 2014, DCS filed a petition alleging that the children were CHINS. Mother and Father admitted that the children were CHINS based on, among other things, their inability to provide the children with an environmentally safe and healthy home and to financially support them on a regular basis, including providing adequate food, and the children were adjudicated CHINS. In February 2014, the juvenile court ordered the parents to, among other things: (1) maintain clean, safe, appropriate, and sustainable housing; (2) cooperate with all caseworkers, the court-appointed special advocate (CASA), and the guardian ad litem (GAL); (3) maintain contact with DCS and notify DCS within forty-eight hours of any changes in housing, household composition, or employment; (4) obtain and maintain suitable employment (Mother); (5) attend and appropriately participate in all visits with children; (6) complete

psychological assessments and follow all recommendations; and (7) enroll in and successfully complete home-based services.

[5] Sonja Laisure with Dockside Services began providing home-based services to Mother and Father in February 2014. She initially met with them once a week, then increased her meetings with them to twice a week. Services focused on budgeting, job and housing assistance, and financial assistance. Because Father received SSI of $721 per month, Laisure focused on helping Mother get a job so that Father's benefits were not reduced if he were employed. But "[v]ery little" progress was made in this respect. *Id.* at 28. That is, Mother would work at a job for a couple days, then lose her job because of transportation issues (the family did not have a car at the time). Laisure helped the parents set up a budget, which was important because they had "[v]ery limited income" with "very limited resources." *Id.* at 27. Indeed, many of their bills were in arrears. But the parents never followed the budget and often overdrew their account due to making purchases of non-essential items. Laisure explained that Mother tried to follow the budget, but Father would not let her because he was very controlling. *Id.* at 47-48. Laisure described the parents' lifestyle as "transient," meaning that they were difficult to get a hold of, they missed appointments, and their cell-phone service was often disconnected. *Id.* at 36. In short, the parents made "very little progress" with Laisure. *Id.* at 40. So in August 2014, the parents' case was transferred to a different caseworker. Eventually, the parents were unsuccessfully discharged from home-based services with Dockside. *Id.* at 93.

[6]  Nicole Gaunt, a therapist with Dockside Services, began working with Mother and Father in early 2014 to provide therapeutic visitation. The purpose was to help the parents "come together to try to gain control of their children during visits." *Id.* at 107. However, Gaunt said that it had "been a struggle [for the parents] in regards to . . . timeliness for visits and making it to visits." *Id.* at 109. In fact, the visits were placed "on hold" eight times because of missed visits. *Id.* She noted, however, that since the parents had purchased a car in February 2016, they had had only "2 no shows" and "their timeliness [had] greatly improved." *Id.* at 110. For one of these no shows, the parents wanted to have one of the visits at their church, which hosted family dinners on Wednesday evenings. Gaunt thought it was a good idea. However, Mother and Father did not show up. The children were upset, and Gaunt ended up taking them to McDonald's for dinner instead. When Gaunt eventually got a hold of Mother, she said she "forgot" about the very visit that she had planned. *Id.* at 115. According to Gaunt, this incident and others illustrated that the children are not a priority to Mother and Father. In the more than two years of therapeutic-visitation services at Dockside, the parents were never able to advance to a lesser-restrictive visitation, such as supervised visitation or in-home visits.

[7]  Mother and Father have also struggled with housing. The home they lived in when DCS removed the children was eventually condemned. They then lived in motels and with family—approximately five residences since DCS got involved in December 2013.

[8]     DCS petitioned to terminate Mother's and Father's parental rights in March 2016. A three-day termination hearing was held on August 17 and September 12 and 19. At the time of the hearing, A.K.S. was thirteen years old, E.T.S. was eleven years old, and N.J.S. was ten years old. The children had been removed from their parents for almost three years. A.K.S. was in one foster care, and E.T.S. and N.J.S. were in another.

[9]     Gaunt testified that after working with the family since early 2014, Mother and Father had not progressed enough "to be able to parent [the children] in a safe and effective way." *Id.* at 128. Although Mother demonstrated improvement in monitoring E.T.S. and N.J.S., Gaunt doubted that she could sustain the required level of supervision without assistance. And although Mother and Father were good at taking direction from Gaunt, they were never able to demonstrate an ability to initiate interventions with the children on their own. As a result, the parents had not progressed past therapeutic visits. Although Gaunt did not dispute that Mother and Father "love[d] their children deeply, and that love [wa]s reciprocated by their children," Gaunt believed that "they do not have the core functionality to be able to meet [the children's] needs." *Id.* at 129.

[10]    The DCS family case manager, Victor Slayton, testified that Mother and Father had recently moved into an apartment (May 2016) but that he had not been able to inspect it. *Id.* at 72. In any event, Slayton said the parents had "moved around several times since [he had] been the Case Manager" and "there ha[d]n't been a consistent residence" yet. *Id.* As for employment, Slayton

testified that just this "past Friday," Father told him that he had obtained employment through a temp agency but that Father did not provide any verification. *Id.* at 80. And Mother testified that she had a full-time job as a housekeeper starting "tomorrow night." Tr. Vol. II p. 6-7.

[11] The CASA, Suzanne Lange, who had been involved with the children since the very beginning in December 2013, testified that it was in the children's best interests for Mother's and Father's parental rights to be terminated based on their lack of progress with referred services and their inability to parent and provide for the children. She explained that Mother and Father had been involved with DCS since December 2013, and housing had been an issue for them the entire time. She visited the parents' new apartment on August 19, which was after the first day of the termination hearing. She described the new apartment—including that the kitchen had no storage and only a refrigerator, that the bedroom earmarked for E.T.S. and N.J.S. had only subflooring, and that the windows had no screens—and concluded that it was "not set up for children." Tr. Vol. I p. 209. Moreover, she reiterated that after more than two years of visitation services at Dockside, the parents had not progressed past therapeutic visitation. The CASA acknowledged that E.T.S. and N.J.S., particularly, were challenging for their foster parent. Although the children would have "setbacks," they were still making "progress." *Id.* at 226. The CASA opined that any issues the children were having were not because of their foster parents' inadequacies but rather because "these children have issues, and will continue to have issues that they will need . . . follow up [on] until they

are adults." *Id.* The CASA believed that adoption would offer the children the stability, consistency, follow through, and advocacy that they need. *Id.* at 219.

[12] The GAL, Nicholas Wallace, also testified that termination was in the best interests of the children. The GAL testified as follows:

> [W]hat concerns me the most about the case is the parent[s'] . . . failure to benefit from the services and remedy the circumstances that . . . caused them to be in the situation that they're found in now. . . . [T]here have been therapeutic visitations in this case for over 2 years and they've never go[tten] to step down from those. The recommendations of the therapist have been to maintain therapeutic visitations. And they had real concerns about the parent[s'] ability to address the needs of the children. And when I met with the children, there were still issues that they needed to address, but it seemed like the foster parents were addressing those issues as best they could.

*Id.* at 230-31.

[13] The juvenile court issued an order terminating Mother's and Father's parental rights to the children in December 2016. The order provides, in pertinent part:

> 2. . . . By . . . clear and convincing evidence the court determines that there is a reasonable probability that [the] reasons that brought about the child[ren]'s placement outside the home will not be remedied. The parents have not been able to progress from requiring therapeutic assistance in providing care for their special needs children. Since their removal in the underlying CHINS case, two of the children, [A.K.S.] and [N.J.S.,] have made some progress. [E.T.S.'s] needs are . . . significant enough to require, as the C.A.S.A. assistant director testified[,] structure **and advocacy.** Although recently in an apartment (within the last five to six months), it is at least the fifth home the parents

have occupied since the entry of the Dispositional Decree [in February 2014]. The home is not yet ready for the children's occupancy. **Given the parent[s'] historic pattern of instability combined with their inability to benefit from the therapeutic visits the Court concludes that . . . there is a reasonable probability that the conditions that resulted [in] the children's removal will not be remedied.**

3. Termination must be in the child[ren]'s best interests and the petitioner must have a satisfactory plan for the care and treatment of the child. . . . In this case the [GAL] and the [CASA] have concluded that termination of parental rights is in the child[ren]'s best interests. The children need a stable home. More importantly they need parenting supervision that meets the children's special academic and physical needs. Although the children are a challenge to their foster care providers, [A.K.S.] and [N.J.S.] have improved academically in foster care. The Court recognizes that the parents' ability to provide may be sufficient for children without special needs. However, they cannot, as therapist Gaunt testified, yet meet the complicated needs of their children. Reunification cannot be achieved at this time. **Thus, the Court finds and concludes that the best interests of the children are served by terminating parental rights and placing them for adoption.**

Mother's Appellant's App. Vol. II pp. 19-20 (second and third emphases added).

[14] Mother and Father now separately appeal.

# Discussion and Decision

[15] Mother and Father contend that there is insufficient evidence to support the termination of their parental rights to the children. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[16] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of
the child.

Ind. Code § 31-35-2-4(b)(2).

# I. Reasonable Probability That the Conditions Resulting in Removal Will Not Be Remedied

[17]     Mother and Father first argue that there is insufficient evidence to support the juvenile court's conclusion that there is a reasonable probability that the conditions that resulted in the removal of the children will not be remedied.[1]  In determining whether the conditions that resulted in a child's removal will not be remedied, the juvenile court engages in a two-step analysis.  "The court first identifies the conditions that led to removal and then determines whether there is a reasonable probability that those conditions will not be remedied."  *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016) (citing *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014)).  A parent's fitness is measured at the time of the termination hearing and changed circumstances are balanced against habitual conduct to see if there is a "substantial probability of future neglect or

---

[1] Mother and Father also argue that there is insufficient evidence to support the juvenile court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children's well-being.  However, the juvenile court did not make such a conclusion in this case.  This is because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B).  *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans denied*.  Accordingly, we do not address this argument.

deprivation." *Id.* Juvenile courts have discretion to weigh a parent's history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of future behavior. *Id.*

[18] Mother and Father claim that the conditions that led to the removal of the children has been remedied because at the time of the termination hearing they had an apartment, a car, and jobs. While this may be true, the record shows that they only acquired these things after the termination petition was filed in this case. That is, DCS removed the children from the parents in December 2013 and the termination petition was filed over two years later in March 2016. Despite receiving substantial assistance from home-based caseworkers at Dockside beginning in February 2014, Mother and Father did not get their car until February 2016, their apartment until May 2016,[2] and their jobs until right before the termination hearing began in August 2016. The juvenile court acknowledged these efforts by the parents, *see* Mother's Appellant's App. pp. 18 & 20 (Findings 27, 28, & 30), but found that the parents' "historic pattern of instability" was more indicative of their future behavior. The juvenile court was within its discretion to disregard efforts made only shortly before termination and to put more weight on Mother's and Father's past behavior.

---

[2] While the juvenile court found that the home was clean, it found that it was not yet ready for the children's occupancy.

Mother also argues that she benefitted from services. For example, she claims that she "tried mightily to establish and maintain the household spending and budget only to be defeated by Father," "was always consistent with visiting her children," and the only reason in-home visits with the children did not occur is because of their financial and housing issues, which were fixed by the time of the termination hearing. Mother's Appellant's Br. pp. 16-17. These claims, however, are contradicted by the juvenile court's findings, which Mother does not challenge on appeal. Specifically, the juvenile court found:

> 15. . . . In August 2014 home based services were transferred to another case manager. At that time the parents had not demonstrated progress in meeting their goals. **The parents had not shown an ability to prioritize their funds for the benefit of the children.**
>
> * * * * *
>
> 19. On several occasions the parent[s'] visitations have been placed on hold (suspended) due to noncompliance with policies. **The parents have arrived late for visits** owing, in part, to their inability, despite the provision of services, to plan for the scheduled visit. For example, attendance at a church dinner was scheduled two weeks in advance. As planned the children were brought to the church but **the parents did not appear.** Near the close of the visit the **Mother texted Ms. Gaunt and indicated that she had forgotten about the plans**. . . .
>
> * * * * *
>
> 22. From the testimony of therapist Gaunt the Court finds that [E.T.S.] and [N.J.S.] require redirection and close monitoring.

> In early 2015 the visitation site was moved from the community to in-office due to the behaviors of [E.T.S.] and [N.J.S.]. Although the Mother has demonstrated improvement in monitoring the boys, therapist **Gaunt opined that she is unsure that the Mother can sustain the required level of supervision without assistance.** Ms. Gaunt testified that the Mother and Father are good at taking direction but **have not demonstrated an ability to initiate interventions with the children on their own.** Ms. Gaunt **does not believe that the parents are able to supervise the children in a safe and effective way.** From Ms. Gaunt's testimony the Court finds that the parents have not demonstrated an ability to benefit from their therapeutic visitations and thus be able to progress to a lesser restrictive model.

Mother's Appellant's App. pp. 17-18 (emphases added). The evidence is sufficient to support the juvenile court's conclusion that there is a reasonable probability that the conditions that resulted in the removal of the children will not be remedied.

## II. Best Interests

[20] Mother and Father also argue that there is insufficient evidence to support the juvenile court's conclusion that termination of their parental rights is in the best interests of the children. To determine what is in a child's best interests, the juvenile court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important

consideration in determining the best interests of a child, and the testimony of service providers may support a finding that termination is in the child's best interests. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed*.

[21] In support of their argument that termination is not in the best interests of the children, Mother and Father again point to the evidence of their new apartment, car, and jobs. As Father puts it, "the parents have gone to great lengths in their attempt to be reunified with their children." Father's Appellant's Br. p. 18. But as we explained above, these efforts came only after the termination petition was filed in this case, and the juvenile court found Mother's and Father's history of conduct to be more telling.

[22] Mother and Father also point out that E.T.S. and N.J.S. are a challenge in their foster placement and that some of E.T.S.'s problems have actually worsened. The record shows that both the CASA and the GAL opined that termination was in the best interests of the children based on Mother's and Father's lack of progress or benefit from referred services and their inability to parent and provide for the children. Although E.T.S. and N.J.S. were still having difficulties, the CASA carefully explained why this was so. That is, although the children would have "setbacks," they were still making "progress." Tr. Vol. I p. 226. Furthermore, the CASA opined that any issues the children were having was not because of their foster parents' inadequacies but rather because "these children have issues, and will continue to have issues that they will need . . . follow up [on] until they are adults." *Id.* The CASA explained that

adoption would offer the children the stability, consistency, follow through, and advocacy that they need. *Id.* at 219. Accordingly, the evidence is sufficient to support the court's conclusion that termination is in the best interests of the children.

# III. Satisfactory Plan

[23] Last, Father argues that there is insufficient evidence of a satisfactory plan for the care and treatment of the children. Indiana courts have traditionally held that for a plan to be "satisfactory" for purposes of the termination statute, it need not be detailed so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re A.S.,* 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied.* A plan to attempt to find suitable parents to adopt the child is satisfactory. *Id.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *Id.* Here, Slayton, the DCS family case manager, testified that the plan for the children was adoption. Although Father speculates that it will be hard to find someone to adopt the children, much less as a sibling unit, DCS's plan for adoption is satisfactory.

[24] Affirmed.

Bailey, J., and Robb, J., concur.