## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 28 2017, 6:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of P.K. and R.K. and:

R.D. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

June 28, 2017

Court of Appeals Case No.
45A04-1611-JT-2584

Appeal from the Lake Superior Court

The Honorable Teresa Hollandsworth, Judge Pro Tem

Trial Court Cause No.
45D06-1506-JT-146
45D06-1506-JT-148

**Vaidik, Chief Judge.**

# Case Summary

R.D. ("Father") appeals the termination of his parental rights to two of his children, P.K. and R.K. Father argues that the evidence is insufficient to support the court's determinations that there is a reasonable probability that Father would not remedy the conditions that resulted in the children being removed from his care, that termination is in the children's best interests, and that there is a satisfactory plan for the care and treatment of the children. Finding sufficient evidence, we affirm.

# Facts and Procedural History

Father has multiple children with multiple women, but only two of his children, P.K., born August 21, 2010, and R.K., born July 12, 2012, are the subjects of this appeal. P.K.'s mother is Pa.K., and R.K.'s mother is L.K.[1]

After P.K. was born, Pa.K. moved out of Father's home and in with her mother ("Grandmother"). Due to Pa.K. being incarcerated and the fact that Father had not established paternity for P.K., Grandmother was appointed as P.K.'s legal guardian. Father knew that P.K. was living at Grandmother's house and that her home was not suitable for P.K., yet he never visited or sought to establish paternity and take custody of P.K. In February 2012, the Department

---

[1] The record indicates that Pa.K. had a history of drug use and passed away from an overdose in 2015. L.K. was not present for the termination hearing where her parental rights to R.K. were also terminated; L.K. is not a party to this appeal. Accordingly, this opinion discusses only the facts relevant to Father's case.

of Child Services (DCS) received a report of domestic violence at Grandmother's house, and P.K. was removed from her care. Four days later, DCS petitioned the court to declare that P.K. was a child in need of services (CHINS). At a hearing on the petition, Grandmother admitted to the underlying allegations, and P.K. was adjudicated a CHINS. Father was also in attendance at the hearing because he was alleged to be P.K.'s father. It was at this hearing that Father learned that Grandmother was P.K.'s legal guardian. When the court stated that the permanency plan for P.K. was reunification with Grandmother, Father told the court that he would not participate in services with DCS and walked out of the hearing.

[4] Four months later, in July 2012, L.K. gave birth to R.K. Father, again, was presumed to be R.K.'s Father, but he did not sign R.K.'s birth certificate or otherwise establish paternity for R.K. At birth R.K. tested positive for cocaine. One month later, DCS filed a CHINS petition on his behalf, and R.K. was adjudicated a CHINS. DCS did not remove R.K. from L.K. or Father. Sometime in September 2012, Father called DCS to report his suspicion that L.K. was using drugs. DCS removed R.K. from the home. Father never requested that R.K. be placed solely with him.

[5] Because Father was alleged to be the father of both P.K. and R.K., the court combined P.K.'s and R.K's cases into one proceeding. In April 2013, the court ordered Father to complete a DNA test to establish paternity; Father did not comply with the initial order and had to be ordered two more times to complete the DNA test. *See* Exs. CC, DD, EE. The testing established Father's paternity

of the children. The court then ordered Father to participate in services through DCS. Father complied with this order and began working with DCS and its service providers.

[6] Due to Father's compliance with services, in February 2014, the court updated the permanency plan for the children; Father was to obtain legal custody of P.K. and reunify with R.K. The following month, DCS initiated a transition plan for the children to re-enter Father's home. R.K. was to move back into Father's home, with DCS doing spot checks multiple times per week, and P.K. was to have overnight visits on the weekend. At this time, Father was not actively working but was receiving disability income due to anxiety and a rapid heartbeat. Despite not working, Father requested that DCS provide child care for R.K. during the day. Father, however, received too much money through disability to qualify for state-assisted child care. DCS tried to help Father locate alternative child care near him, but Father did not pursue any other options.

[7] While R.K. was in Father's care, Father's car caught on fire and was completely destroyed. Father began feeling overwhelmed by his car situation and parental responsibilities. Father's relative told him about a family that was looking to adopt a child, and Father allowed the family to take R.K. for a week. Father never met the family or visited their home. While in the family's care, R.K. suffered a leg injury and was taken to the emergency room. DCS was called, and R.K. was removed from Father's care and returned to foster care with P.K. When asked why he had let R.K. go live with the family, Father told DCS that "he's a male and he did not have the genetic makeup to care for the

child." Tr. Vol. II p. 32. Father went on to tell DCS, "[DCS] should basically be happy that he was a father and stood up to take some responsibility for his child. But he had no intent on following DCS' rules regarding childcare arrangements for a DCS ward." *Id.*

[8] The transition plan for the children was terminated. The court ordered Father to participate in supervised visitation and to continue with services through DCS. Father did not attend visitation on a consistent basis, making only four out of thirteen appointments. Father's failure to visit the children was "very traumatic" for the children, especially P.K. *Id.* at 42. Father also did not attend any appointments with DCS or its service providers. DCS then petitioned to terminate Father's parental rights to the children on June 11, 2015. A two-day hearing was held on the termination petition in July 2016.

[9] During the hearing, Father told the court that DCS's services did not help him become a better parent because he had already gone through services for one of his older children. "I didn't benefit at all." Tr. Vol. I p. 41. "I have children trying to teach me to be a father and I've got kids that are their age. I don't understand how they could influence or help me." *Id.* at 60. When questioned about why he left R.K. with strangers, Father explained that he never intended to let the family adopt R.K. and that he only let them watch R.K. so that he could find a new car.

[10] Jennifer Vickers, Father's therapist, also stated that Father had told her that he was "overwhelmed" and that taking care of R.K. was "too much for him. And

what he had hoped was that he could keep one of the children, particularly [P.K.]. Because he had a better bond with him. And that he was hoping that [R.K.] could become adopted." *Id.* at 169-70. Father repeatedly told Vickers that he could not handle watching both children. He asked for guardianship to be given to his mother, but she did not pass DCS's background check. Vickers further testified that Father was diagnosed with narcissistic personality disorder, which Father denies having. When left untreated, narcissistic personality disorder poses a safety threat to children because the individual engages in impulsive decision making. *See id.* at 195.

[11] A therapist for P.K. stated that the children's foster parents are their pre-adoptive parents. DCS's plan after termination was for the foster parents to adopt the children. The pre-adoptive parents have created a stable home where the children are thriving. The children are bonded with their pre-adoptive parents, and it would be disruptive to the children's well-being to remove them from the pre-adoptive home. The Family Case Manager (FCM) also stated that the plan for the children was adoption.

[12] The trial court concluded that there was a reasonable probability that the conditions resulting in the removal of the children from Father's home would not be remedied; there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the children; termination was in the children's bests interests; and DCS had a satisfactory plan for the care and treatment of the children, adoption by the foster parents. In support of its conclusions, the court stated:

Father testified he was not sure [P.K.] was his child so he did not pursue custody or visitation with [P.K.]. Further, Father testified he knew maternal Grandmother's home was unsafe, but he did not intervene or attempt to establish Paternity.

*****

Father testified he became overwhelmed with caring for [R.K.]. . . . Father testified that it was difficult to care for both children at the same time. Father testified that being both Mother and Father was too much for him to handle without help.

*****

Father repeatedly testified that the services offered were of no service to him. In fact, Father testified that he was teaching the service providers instead of them teaching him. Father testified that he was not able to take anything from counseling and implement it in his life to make him a better parent. He testified that he does not need any help regarding parenting.

*****

Father became sporadic with his visitations after [R.K.]'s removal and became non compliant in participating in his other services. Of the thirteen (13) scheduled visits, Father only participated in four (4) visits. . . . The lack of attendance by Father was traumatic to the children.

*****

Father failed to give any reason for need for childcare when he is unemployed, other than his car caught fire and he needed to obtain new transportation. There is no logical reason that a

parent would need to leave [a] twenty-two (22) month old child, with complete strangers, for a period of 5 to 7 days in order to obtain new transportation.

*****

Father's impulsive behavior places the children in harms way [sic].

*****

The Court further finds that these matters have been pending now for four (4) years with the Court attempting to reunify with a Grandmother, both Mother and Father, and all attempts for reunification have drastically failed. These children deserve permanency.

Appellant's App. Vol. II pp. 2-7.

[13] Father now appeals.

# Discussion and Decision

[14] Father contends that there is insufficient evidence to support termination of his parental rights. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To

determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[15]     A petition to terminate parental rights must allege, among other things:

>    (B) that one (1) of the following is true:
>
>    (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
>    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
>    (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
>    (C) that termination is in the best interests of the child; and
>
>    (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

# I. Reasonable Probability That the Conditions Resulting in Removal or the Reasons for Placement Outside the Home Will Not Be Remedied

[16]     Father first argues that there is insufficient evidence to support the court's conclusion that there is a reasonable probability that the conditions that resulted

in the children's removal or the reasons for their placement outside the home will not be remedied.[2] In determining whether the conditions that resulted in the children's removal will not be remedied, the trial court engages in a two-step analysis. "The court first identifies the conditions that led to removal and then determines whether there is a reasonable probability that those conditions will not be remedied." *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016) (citing *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014)). A parent's fitness is measured at the time of the termination hearing and changed circumstances are balanced against habitual conduct to see if there is a "substantial probability of future neglect or deprivation." *Id.* In cases where children are not initially removed from the parent contesting the termination of parental rights the trial court must first determine what conditions led to DCS placing and then retaining the child in foster care rather than placing the child with the parent. *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010).

[17] The State contends that the initial reason for the children's placement in foster care, rather than with Father, was due to Father's unwillingness to serve as a parent for the children. We agree. After P.K. was removed from the care of Grandmother and R.K. was removed from the care of L.K., they were placed in

---

[2] Father also argues that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children's well-being. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See In re E.P.*, 20 N.E.3d 915, 921 (Ind. Ct. App. 2014), *trans. denied*. Because we conclude that there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in the children's removal will not be remedied, we do not address this argument.

foster care rather than with Father because he had not established paternity for either child. Paternity was not established until the court ordered Father to submit to DNA testing, an order that the court had to issue three separate times before Father complied.

[18] Father did not attempt to establish a bond with the children until after paternity was established. He began participating in services through DCS and visitation. Father did so well that DCS established a transition plan for the children to move into his home, first R.K. and then P.K. During the transition, Father told his therapist that he was overwhelmed caring for both children and suggested that only P.K. be placed with him and that R.K. be put up for adoption. He also suggested that his mother should be the children's legal guardian. While caring for only R.K., Father requested child care throughout the day even though he was not working. When Father did not qualify for state-assisted child care, he left R.K. with strangers for a week. Father claims he did this because he was trying to locate new transportation and that "the court failed to take into consideration the reason that R.K. was left with the family[.]" Appellant's Br. p. 13. The trial court considered his reasoning but rejected it: "There is no logical reason that a parent would need to leave [a] twenty-two (22) month old child, with complete strangers, for a period of 5 to 7 days in order to obtain new transportation." Appellant's App. Vol. II p. 6. Once the children were back in foster care, Father failed to attend supervised visitations and participate in services.

Other than a brief period of compliance after paternity was established, Father has consistently demonstrated an unwillingness to be a parent for the children. He has denied having mental-health problems, claimed that he has had to teach DCS's service providers how to parent, asked DCS to place the children with his mother, and left R.K. in the care of strangers for a week. Father's actions have shown that he does not wish to do the work it takes to be a parent for his children and that there is a reasonable probability that the conditions that resulted in removal of the children or the reasons for the children's placement outside the home will not be remedied.

## II. Best Interests

Next, Father contends that the evidence is insufficient to conclude that termination is in the children's best interests. To determine what is in a child's best interests, the juvenile court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

Father contends that the "trial court failed to address the pain and suffering that the children will have to suffer when they realize that they will not have any further contact with their father or his family." Appellant's Br. p. 14. We disagree. While one service provider stated that it was "very traumatic" for P.K. when Father failed to attend his supervised visitation, Tr. Vol. II p. 42,

P.K.'s therapist said that P.K. was bonded to his pre-adoptive parents and that it would be disruptive for both children to be removed from their pre-adoptive parents. Father presented no evidence that the children were bonded to any of his other family members.

[22] Furthermore, Father's therapist stated that Father has narcissistic personality disorder, a diagnosis that he denies. If untreated, individuals who suffer from this disorder are prone to making impulsive decisions, like placing their child in the care of complete strangers for a week. Sufficient evidence was presented to conclude that termination of Father's parental rights is in the children's best interests.

## III. Satisfactory Plan for Care and Treatment

[23] Father also contends that there is insufficient evidence to establish that there is a satisfactory plan for the care and treatment for the children. DCS's plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). This Court has held that adoption is a "satisfactory plan" for the care and treatment of a child subject to the termination-of-parental-rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009).

[24] Father argues that the foster parents were at the hearing but failed to testify that they were willing to adopt the children. He contends that this lack of testimony, along with the fact that no petition for adoption has been filed,

proves that a satisfactory plan was not in place for the children. Father's argument ignores the testimony of P.K.'s therapist, who identified the children's foster parents as their pre-adoptive parents and said that they have told the therapist that they want to adopt the children. Furthermore, the FCM stated that the permanency plan for the children was adoption. This testimony is sufficient to show that DCS has a satisfactory plan in place for the care and treatment of the children. *See id.* (concluding that testimony of DCS caseworker that the plan for the child was adoption is enough to show that a satisfactory plan for the care and treatment of the child was in place).

[25] Affirmed.

Bailey, J., and Robb, J., concur.