

FILED

Nov 10 2016, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan W. Tanselle
Capper Tulley & Reimondo
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of A.W. and G.S.:


H.S. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 10, 2016

Court of Appeals Case No.
54A01-1604-JT-1090

Appeal from the Montgomery Circuit Court

The Honorable Harry A. Siamas

Trial Court Cause No.
54C01-1508-JT-187
54C01-1508-JT-188

**Vaidik, Chief Judge.**

# Case Summary

H.S. ("Mother") and G.S. ("Father") are married and have one child together, G.A.S. Mother has a second child, A.W., from a prior relationship. Mother and Father have raised both children together. After Mother and Father were arrested at the same time, the Department of Child Services ("DCS") took the children and eventually placed them in foster care. DCS filed petitions to terminate the parental rights of both Mother and Father to their respective children. At the time of the termination hearings, Mother was incarcerated for a drug offense and scheduled to be released in seven months. She and Father both testified that they intend to remain together and live together once Mother is released from prison. The trial court concluded that Mother's rights to A.W. and G.A.S. should be terminated, but Father's rights to G.A.S. should not be terminated. The trial court made no mention of the fact that Mother would be living with Father, and therefore G.A.S., despite the termination order. Mother appeals.

We find that the trial court's decision to terminate Mother's rights knowing she will be living with G.A.S. is incongruous with and antithetical to the trial court's finding that the conditions that resulted in the removal of A.W. and G.A.S. from Mother will not be remedied. That contradiction, together with Mother's efforts in prison to better herself, lead us to conclude that DCS failed to prove by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in A.W.'s and G.A.S.'s removal from Mother will not be remedied. Accordingly, we reverse.

# Facts and Procedural History

[3] Mother and Father were married in 2011 and have one child together, G.A.S., born May 6, 2011. Mother has another child from a prior relationship, A.W., born January 19, 2008. J.W. is A.W.'s biological father and has not had contact with A.W. since she was five months old. Mother and Father have raised A.W. and G.A.S. together.

[4] On March 18, 2014, Mother, Father, and the children were staying at Comfort Inn in Crawfordsville. Mother and Father got into a fight. The police were called, and both parents were arrested, Mother for possession of heroin, and Father for violating a restraining order Mother had taken out against him. DCS was called to care for the children and took them into protective custody. The children were initially placed with Father's mother. DCS filed a children in need of services ("CHINS") petition on March 20, and both children were adjudicated CHINS on May 14. The court then entered a dispositional order requiring Mother to participate in a variety of services, including individual therapy, home-based case management, and a substance-abuse assessment. The order also required both Mother and Father to submit to DCS for drug screening and to allow DCS to enter their home whenever requested.

[5] In her criminal case, Mother was sentenced to probation in July 2014. She had the "standard terms of probation" plus additional terms that "she complete the Court Referral Program and follow all recommendations, that she complete mental health counseling and that she comply with all DCS recommendations

and directions." Tr. Vol. I p. 48. DCS recommended that Mother have supervised visitation with A.W. and G.A.S., begin individual therapy and substance-abuse treatment, meet with a home-based case manager, and start intensive outpatient (IOP) treatment. In October, Mother was found to have violated probation for failing multiple drug screens, missing meetings with her probation officer, failing to complete IOP treatment, and committing a new criminal offense. Mother's probation was revoked; she was sentenced to jail and remained incarcerated until December, when she was released on probation for a second time. Mother's new probation terms included a no-contact order with Father, enrollment in drug-treatment therapy, attendance at ninety Narcotics Anonymous or Alcoholics Anonymous (NA/AA) meetings in ninety days, obtain employment, and compliance with all DCS recommendations. On May 22, 2015, the court found that Mother had violated probation for a second time by contacting Father and sporadically attending NA/AA meetings and therapy sessions. The court revoked Mother's probation and ordered that she serve the remainder of her original sentence.

[6] Following his March 2014 arrest, Father was released in May. Father eventually moved in with his mother, E.S., who had custody of A.W. and G.A.S. At the time, DCS had issued an order forbidding Mother and Father from living with E.S. DCS discovered that Father was living with E.S. and placed A.W. and G.A.S. in foster care on December 22.

[7] On August 20, 2015, DCS filed a Petition for Involuntary Termination of Parental Rights, requesting the termination of the parent-child relationship of

Mother and J.W. to A.W. DCS filed a second termination petition regarding the parent-child relationship of Mother and Father to G.A.S. The court held hearings on January 20 and March 17, 2016. Mother was still in prison at the time of both hearings. At the time of the termination hearings, Mother's anticipated release date was October 14, 2016.[1]

[8]     Among the testimony given at the January hearing, DCS service providers stated that Mother and Father are appropriate with both children in their supervision and interactions and there are no concerns with their parenting. The service providers, the Court Appointed Special Advocate (CASA), and the Family Case Manager (FCM) expressed concern that Mother and Father's relationship had a volatile history and would remain unstable in the future because the service providers were unable to work with Mother and Father as a married couple due to the fact that Mother had been incarcerated for the majority of the proceedings. Mother, on the other hand, testified that her and Father's volatile history was due to drugs and that she had been sober for ten months, attending bi-weekly AA meetings while in prison. Mother also stated that she had completed intensive outpatient substance-abuse treatment.

[9]     In addition to her bi-weekly AA meetings, Mother had participated in weekly mental-health counseling—she was diagnosed with post-traumatic stress

---

[1] Mother testified that this would be her release date, and the Indiana Department of Correction's Offender Search shows that Mother was in fact released on this date. Ind. Dep't of Correction, *Offender Search*, http://www.in.gov/apps/indcorrection/ofs/ofs (last visited Oct. 27, 2016).

disorder, borderline personality disorder, and ADHS (severe adult ADHD)—
two parenting classes, and a family class. Mother received authorization for
work duty and was one of two prisoners given clearance to clean the
superintendent's and assistant superintendent's offices. Mother stated that the
only time she did not participate in services while incarcerated was when she
was at Rockville because "it's intake, you're not allowed to, there are no
programs available . . . ." Tr. Vol I. p. 72.

[10] Mother continued to have a relationship with A.W. and G.A.S. after their
removal in March 2014. Before her incarceration in May 2015, she maintained
contact with her children through visitation and phone calls. After her
incarceration, Mother continued to see her children regularly when the foster
mother brought them to visit in prison. However, Mother was unable to
continue her phone calls with A.W. and G.A.S. Father testified that Mother
called multiple times from prison during his visitation time in an effort to speak
with the children, but DCS prevented Mother from speaking with them.

[11] Mother told the court that she and Father are still married, have violated no-
contact orders because they are married, and intend to stay together once
Mother is released from prison. In response to why she violated the no-contact
order, Mother stated, "We kept our distance for quite some time, but you've got
to understand that we are married and we have children together . . . . [Y]es I
had contact with my husband, that's my husband." *Id.* at 62. She went on to
say that it is important for her to get out of prison "[t]o rehabilitate my life and
reunify my family. You know get to the steps to be able to become the mother

necessary for my children to have, my children deserve." *Id.* at 67. Mother also told the court that upon release she was prepared to reengage with DCS and its service providers.

[12] Regarding the children, the foster mother indicated that both A.W. and G.A.S. are "very closely bonded" and that in her opinion it would be in their best interests to remain together. *Id.* at 154. Furthermore, the FCM stated that it would "be important" for the children to remain together. *Id.* at 169. Father desires to keep his family intact. "I wish nothing more than to share these children with my wife . . . . I love my wife and I want my wife to come home." Tr. Vol. II p. 40-41. He went on to say, "I don't want my children split up. I look at [A.W.] just like she's my daughter . . . ." *Id.* at 49. Father also reiterated the foster mother's and the FCM's testimony that A.W. and G.A.S. would "hurt dearly" if they were separated. *Id.* Father, however, did state that he is prepared to separate from Mother if she relapses and uses drugs again: "[S]he knows, I've talked to her and told her there will be no drug use allowed around these children. There will be no more mistakes." *Id.* at 43.

[13] The trial court entered its Findings of Fact, Conclusions of Law and Judgment on March 29, 2016. The trial court did not terminate Father's rights to G.A.S., concluding that DCS had not proven by clear and convincing evidence that there was a reasonable probability that the conditions that resulted in G.A.S.'s removal from Father will not be remedied and that termination of the parent-child relationship between G.A.S. and Father is not in G.A.S.'s best interests. The court did terminate Mother's rights to both A.W. and G.A.S., finding that

DCS had proven by clear and convincing evidence that there was a reasonable probability that the conditions that resulted in A.W.'s and G.A.S.'s removal from Mother's care will not be remedied and that termination of the parent-child relationship between Mother and both of her children is in the best interests of the children. The court's order did not preclude Mother from seeing Father or G.A.S. J.W.'s parental rights to A.W. were also terminated.[2] The court noted that its order "might well result in [A.W.] and [G.A.S.] being separated as siblings and that this important sibling bond may be broken." Appellant's App. p. 20. Nevertheless, the court concluded that DCS's plan to have A.W. adopted by her foster parents is satisfactory.

[14] Mother appeals.[3]

# Discussion and Decision

[15] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a

---

[2] J.W. does not appeal the termination of his parental rights to A.W.

[3] DCS did not appeal the trial court's denial of the petition with regard to Father's parental rights to G.A.S., nor did DCS take issue with that denial in response to Mother's appeal. Accordingly, the trial court's decision regarding Father's rights is no longer at issue.

judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. "Clear and convincing" is a standard of proof that lies between the "preponderance of the evidence" and "beyond a reasonable doubt" standards. *J.C.C. v. State*, 897 N.E.2d 931, 934 (Ind. 2008). The clear-and-convincing standard is not a burden of convincing the court that the facts presented are certainly true, almost certainly true, or true beyond a reasonable doubt. *Id.* However, this standard is

greater than a burden of convincing the court that the facts are more probably true than not. *Id.*

[17] Involuntary termination of parental rights is "the most extreme measure that a court can impose and is designated only as a last resort when all other reasonable efforts have failed." *In re N.Q.*, 996 N.E.2d 385, 391 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but rather to protect the children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

[18] Mother argues that DCS did not show by clear and convincing evidence that there is a reasonable probability that the conditions that led to the removal of A.W. and G.A.S. would not be remedied. To determine whether the conditions that resulted in the children's removal will not be remedied, the trial court engages in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). The court first identifies the conditions that led to removal and then determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* Trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of her future behavior. *Id.*

[19] We conclude that DCS did not prove this element by clear and convincing evidence. The children were initially removed from Mother because of Mother's incarceration and drug use. Given the circumstances, the fact that the trial court terminated Mother's rights, but not Father's rights to G.A.S., undermines the court's finding that the conditions leading to the removal of A.W. and G.A.S. will not be remedied. While the Indiana Code does not prohibit terminating only one parent's rights to a child, terminating only one parent's rights here is incongruous. Mother was scheduled to be released from prison seven months after the termination hearing. Mother and Father remain married and both testified to their intent to stay together. In other words, after Mother's release from prison, the parents would live together with G.A.S. DCS case workers testified that they had no concerns with Mother's abilities as a parent but had serious reservations about Mother and Father reuniting. The CASA told the court, "[T]he parents['] relationship has clearly historically been toxic and so that's a major concern whether or not they can work things out, whether or not through therapy, couples counseling, domestic violence counseling, whether or not they can achieve stability for their children." Tr. Vol. II p. 66. Despite these concerns, the trial court did nothing to prevent Mother and Father from living together with G.A.S. Allowing Mother to live

with G.A.S. supports the conclusion that DCS has failed to prove by clear and convincing evidence that Mother's drug problem is unlikely to be remedied.[4]

[20] Additionally, we agree with Mother that her situation is factually similar to that of the father in *In re K.E.*, 39 N.E.3d 641 (Ind. 2015). In *K.E.*, father showed at the termination hearing that he had made substantial efforts toward bettering his life while in prison by completing twelve classes, including a responsible parenting class, and attending AA and NA meetings. Father indicated that he was done using drugs and would like to receive additional services from DCS upon release. Our Supreme Court held that DCS did not prove by clear and convincing evidence that father could not remedy the conditions for K.E.'s removal:

> Despite Father's criminal and substance abuse history, his recent improvements at the time of the termination hearing were not balanced against his habitual patterns of conduct. Given the substantial effort that Father is making to improve his life . . . it was not proven by clear and convincing evidence that Father could not remedy the conditions for K.E.'s removal. . . . [T]here is seemingly nothing else that Father could have been doing to demonstrate his dedication to obtaining reunification.

---

[4] If Mother continues to use drugs then Father has a duty to separate himself from Mother and keep her away from G.A.S. Father's duty is the same regardless of whether Mother's rights are terminated. If Mother relapses and Father fails to separate himself and G.A.S. from her, then his rights to G.A.S. might be in jeopardy. This Court has consistently held that a parent's failure to protect his child from a third party is grounds for termination. *See In re A.H.*, 751 N.E.2d 690, 699 (Ind. Ct. App. 2001), *trans. denied*; *Alexander v. LaPorte Cty. Welfare Dep't*, 465 N.E.2d 223, 226 (Ind. Ct. App. 1984); *In re Perkins*, 352 N.E.2d 502, 509 (Ind. Ct. App. 1976); s*ee also* Ind. Code § 31-34-1-2 ("A child is a [CHINS] if . . . the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian . . . .").

*Id.* at 649.

[21]	Just as the Court found in *K.E.*, there is "seemingly nothing else" that Mother could have done to demonstrate her commitment to becoming a better person and better parent, and obtaining reunification with her children. At the time of the termination hearing, Mother had made significant progress in dealing with her addiction. During her recent incarceration, Mother participated in and completed individual therapy, AA meetings, parenting classes, and family classes. These programs are almost identical to the services the trial court ordered for Mother in its July 2014 dispositional order. Mother also participated in early-release classes and was one of two prisoners given the responsibility to clean the superintendent's and assistant superintendent's offices. Further, Mother has been released and is presumably living with G.A.S. and Father.

[22]	There is some evidence in the record to support the trial court's conclusion to terminate Mother's parental rights—e.g. positive drug screens and probation being revoked twice. However, when we look at Mother's history against her efforts while in prison, coupled with the fact that she is presumably living with Father and G.A.S., we are left with only one conclusion: DCS did not prove by clear and convincing evidence that there is a reasonable probability that the

conditions that resulted in the removal of G.A.S. and A.W. would not be remedied.[5]

[23]    One final matter convinces us that this family deserves another chance at reunification. The trial court has essentially allowed Mother, Father, and G.A.S. to reunite but has left A.W., who by all accounts is seen as Father's daughter, separated from her family. DCS must prove by clear and convincing evidence that termination of Mother's parental rights is in the best interests of her children. *In re J.C.*, 994 N.E.2d 278, 289-90 (Ind. Ct. App. 2013), *reh'g denied*. To determine what is in the best interests of the children, the court must look at the totality of the circumstances. *In re A.G.*, 45 N.E.3d 471, 479 (Ind. Ct. App. 2015), *trans. denied*.

[24]    Here, the FCM and the foster mother testified that it was in A.W.'s and G.A.S.'s best interests to remain together. Father testified at the March hearing that A.W. and G.A.S. have been together their entire lives and would "hurt dearly" if they were separated. Tr. Vol. II p. 49. Father also stated that he understood that he had no legal rights to A.W., but stated, "I look at [A.W.] just like she's my daughter . . . I want them both back." *Id.* Father went on to say that "I do not believe it is in their best interests to be split up at this point in time." *Id.* The trial court even called the children's relationship with one

---

[5] DCS attempts to distinguish *K.E.* by pointing out that unlike K.E.'s father, Mother's crimes were committed after giving birth to A.W. and G.A.S. We are not convinced that this factor was the gravamen of our Supreme Court's decision in *K.E.*

another an "important sibling bond . . . ." Appellant's App. p. 30. Despite all of this testimony, the trial court still concluded that A.W. and G.A.S. should be separated; A.W. is to be placed for adoption, and G.A.S. is to be returned to the care of his Father. We conclude that DCS has failed to prove by clear and convincing evidence that terminating Mother's rights to A.W. and G.A.S., thus separating the children, is in their best interests.

Reversed.

Baker, J., and Najam, J., concur.