## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 27 2018, 9:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher L. Clerc
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.D., M.D., and J.H.D. (Minor Children), and

E.D. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

July 27, 2018

Court of Appeals Case No. 18A-JT-132

Appeal from the Bartholomew Circuit Court

The Honorable Kelly S. Benjamin, Judge

The Honorable Heather M. Mollo, Magistrate

Trial Court Cause Nos. 03C01-1609-JT-5154, -5155, -5157

**Crone, Judge.**

# Case Summary

E.D. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor children, J.D., M.D., and J.H.D. (collectively "the Children"). Mother contends that the trial court erred in concluding that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied. Finding no error, we affirm.

# Facts and Procedural History

J.D. and M.D. were born in January 2009, and J.H.D. was born in April 2011. In September 2014, the Indiana Department of Child Services ("DCS") removed the Children from Mother's home after school officials saw bruises on J.D. and M.D. that had been inflicted by Matthew Coon, Mother's live-in boyfriend. Coon later pled guilty to two counts of level 6 felony battery on a person less than fourteen years old. DCS filed a petition alleging that the Children were children in need of services ("CHINS"). In October 2014, Mother admitted that the Children were CHINS "and that the injuries would not have occurred but for the act or omission of a parent or custodian in the home." Appealed Order at 3. The trial court issued a dispositional decree requiring Mother to participate in counseling and other services, obtain suitable and stable housing, allow DCS access to the home, "obtain and maintain a legal source of income[,]" and "attend all scheduled appointments with service providers[,]" among other things. *Id.* at 3.

[3] In June 2016, the Children were returned to Mother's home for a trial home visit, which was terminated two months later after "concerns of domestic violence occurring in the home were ... reported by the [C]hildren." DCS Ex. 16. The Children were placed in foster care.

[4] In September 2016, DCS filed a petition for the involuntary termination of Mother's parental rights. The trial court held a factfinding hearing in February 2017. In December 2017, the court issued an order containing the following relevant findings:

> 6. The twins [J.D. and M.D.] started counseling in December 2014 to address trauma resulting from the physical abuse [inflicted by Coon]. Both boys were diagnosed with Post[-]Traumatic Stress Disorder. The boys were experiencing nightmares, bedwetting, and a started [sic] reflex.
>
> 7. The twins continued in counseling for sixteen months, with a discharge in April 2016. Self-esteem increased for the twins and they each could talk about the abuse. At counseling closure, the boys no longer met the criterial [sic] for Post-Traumatic Stress Disorder.
>
> 8. In the spring of 2015, Mother was participating in individual therapy and home-based case management services.
>
> 9. Mother made rapid progress in her living circumstances and stability. In this area, Mother was very proactive. She secured and maintained employment. Mother moved into her own house, without financial assistance from DCS. She paid all outstanding fees to get her driver's license reinstated and obtained a vehicle.
>
> 10. The individual therapy focused on the nature of domestic

violence, domestic violence education, parenting education, and creating a child focused home.

….

12. Despite Mother regularly attending and actively participating in therapy sessions, [therapist Kimberly] Beck was of the opinion that Mother did not gain meaningful insight into understanding and identifying domestic violence relationships. Nor did she gain meaningful insight as to how being in a domestic violence relationship could affect her Children.

13. Mother was recommended to complete a psychological evaluation in the spring of 2015 after another service provider noted concerns that Mother appeared manic at times.

14. Mother was referred for a psychological evaluation, and completed the evaluation on June 2, 2015.

15. Mother was diagnosed as having Histrionic Personality Disorder.

16. By the time of the psychological evaluation, Mother identified Matthew Coon as a former boyfriend. Mother confirmed that she knew Mr. Coon was abusing the Children. She allowed the abuse to continue, as she needed him to help watch the Children.

17. Mother reported a series of rapid romantic relationships during the psychological evaluation. The evaluator, Dr. Linda McIntire, found the pattern of romantic relationships to be psychologically concerning for two reasons. First, Mother presented as markedly emotionally immature. Second, Mother had a significant need to have an attachment with a man.

18. Dr. McIntire found Mother's immaturity to be comparable to a thirteen or fourteen year old.

….

21. Dr. McIntire explained that a person with Histrionic Personality Disorder has an unrelenting need to meet their immediate needs. For a parent with the disorder, the parent becomes the center of the house rather than the children.

22. With Histrionic Personality Disorder, the individual is unlikely to change as the behaviors seem normal to the individual, causing a lack of insight.

23. Dr. McIntire was of the opinion that Mother's prognosis was poor concerning treatment and rehabilitation for her personality disorder. Specific concern was noted that Mother's need for attention and love will be greater than the desire to keep the Children safe.

24. Mother's romantic priorities were noted as concerns during Court reviews as early as March 19, 2015. During the hearing, it was noted that "Mother is encouraged to make the children a priority over any romantic interest and to really take a hard look at the effects of domestic violence."

25. At a July 28, 2015 Court Hearing, Mother's diagnosis was discussed. A recent relational decision by Mother underscored the dynamics of her personality disorder. By the time of the hearing, Mother had jumped into a romantic relationship, had moved in with the male, had married him and had already separated.

26. At the Court hearing in September 2015, there were some signs of greater maturity with Mother but still much to be demonstrated. She was displaying good motivation with her case plan services. However, findings were made that Mother still needed to demonstrate "an understanding of the boys' trauma and physical abuse." In addition, Mother's personal choices still

caused concern as to her ability to "safeguard the children."

27. At the point that the CHINS case had been open for fifteen months, the Children continued out of the home. The findings from a Status Hearing convened in January 2016, included that Mother had completed the Moving On program, a curriculum intended to assist females in making safe choices in relationships. Mother had not yet sufficiently addressed her diagnosis of personality disorder. Her treatment team was questioning whether Mother wanted to be a full-time parent as she missed a visit with the Children after staying out all night with friends. It was also reported that Mother had been late to visits. Her living stability had also declined as Mother had lost her housing and transportation.

28. By the March 2016 Court review, Mother had gained a third shift job. She did not have stable housing or transportation. She had home based casework to assist with her living stability and budgeting. The Children continued in relative care.

29. The Children began a trial home visit with Mother on June 23, 2016.

30. During the trial home visit, Mother introduced Evan Zook to [DCS] FCM [(family case manager)] Jester. He was described by Mother as a friend and positive support to help with childcare. Mother was encouraged to use an outside agency as an alternative to Mr. Zook. Mother insisted she felt more comfortable having Mr. Zook watch the Children.

31. FCM Jester started observing changes in Mother's attitude and compliance with the case plan services.

32. Mother started missing appointments, which the team considered very uncharacteristic of her. By mid-July 2016, the treatment team noted a change in attitude with Mother. She became angry and guarded about Mr. Zook.

33. Mother was questioned whether she and Mr. Zook were in an intimate relationship. Mother maintained that they were only friends and that he was not living in her home.

34. FCM Jester made the effort of discussing with Mother how to define a romantic relationship. Mother continued to deny one existed with Mr. Zook.

35. A Child and Family Team Meeting occurred in Mother's home in the summer of 2016. It was understood and that Mr. Zook was not to attend. During the Child and Family Team Meeting, Mr. Zook was observed to walk forcefully into the house, enter Mother's bedroom, and forcefully exit the home. It was evident that Mr. Zook was upset that Mother had visitors in the home.

36. The Children's' CASA [(court appointed special advocate)] attended this particular Child and Family Team Meeting. He considered Mr. Zook's behavior to be threatening.

37. Shortly after the Child and Family Team Meeting, [M]other missed a therapy appointment. With concerns that something had happened, FCM Jester and therapist Beck went to Mother's home. Mr. Zook answered the door shirtless and in boxer shorts. He yelled toward the bedroom for Mother to get up immediately. On this particular day, the Family Case Manager also noted a window to be knocked out.

38. Ms. Beck had at least three encounters with Mr. Zook. Ms. Beck found Mr. Zook to be territorial, aggressive and defiant. His actions took away any doubt for her that he and Mother were in an intimate relationship. Further, his behaviors were consistent with power and control exhibited in domestic violence relationships.

39. The trial home visit disrupted after DCS received a report

that Mr. Zook was physically punishing the Children while left in his care by Mother.

40. The Children reported domestic violence in Mother's home.

41. Ms. Beck continued to be Mother's therapist, through the failed Trial Home Visit in the summer of 2016.

42. Mother had difficulty in understanding why the Trial Home Visit failed. In the opinion of her therapist, Mother's barometer for danger is broken. Mother is unable to recognize when situations or relationships are harmful to her. Mother was unable to detect the warning signs of an abusive relationship. Mother failed to understand how her choices and actions in allowing individuals into her home and the Children's lives could affect the Children's physical and mental wellbeing.

43. Following the disruption of the trial home visit, the home based case manager provided Mother with additional parenting education to assist in reunification; however, Mother missed several appointments, and the referral was closed for lack of participation.

….

47. Even as late as December 2016, four months after the disruption of the Trial Home Visit, members of [the] treatment team saw signs that Mr. Zook continued to be present at Mother's home. In October, Mother admitted that Mr. Zook was still a frequent visitor in her life, that he "checked in on her" and that she appreciated him doing so.

48. In December 2016, the FCM took a picture of two vehicles parked at Mother's home. The license plate on one of the vehicles was registered under Mr. Zook's name. At trial Mother testified that the car in question belonged to her. She maintained she bought the car from a third party, received only a bill of sale,

and put Mr. Zook's license plate on the vehicle in question. ….

49. Whatever the extent of the ongoing contact Mother was having with Mr. Zook, it causes concern that Mother continues to put her needs above the Children. By her testimony at trial, Mother can verbally state that she understands that her male relationships can affect the safety of the Children. By the testimony of the treatment team at trial, Mother was clearly made aware that Mr. Zook was considered a threat to her safety and that of the Children. Yet by Mother's choices, the treatment team is left to doubt whether Mother has made a clean break from Mr. Zook[.]

….

53. CASA, David Spear, testified to continued concern that Mother has not demonstrated the ability to provide the Children with a safe home, given the history surrounding her choices of romantic partners and allowing the romantic partners to become caregivers of the Children. In the CASA's opinion, the Children have now been injured twice because of Mother's relationship choices and her trust in these individuals to provide appropriate supervision and discipline. Mother has failed to progress sufficiently in therapy to be satisfied that similar events are unlikely.

Appealed Order at 4-9 (citations to exhibits omitted).

[5] Based on those findings, the trial court concluded that DCS had established by clear and convincing evidence that the Children had been removed from Mother for more than six months pursuant to a dispositional decree, that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied, that

there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being, that termination of parental rights is in the Children's best interests, and that there is a satisfactory plan for the Children's care and treatment, that being adoption. Accordingly, the trial court granted DCS's petition to terminate Mother's parental rights. This appeal ensued.

## Discussion and Decision

[6] The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to her children. *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008). "Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* The purpose of terminating parental rights is not to punish the parents, but to protect the children. *Id.* Thus, although parental rights are of a constitutional dimension, the law provides for the termination of those rights when the parent is unable or unwilling to meet her parental responsibilities. *Id.*

[7] A petition for the involuntary termination of parental rights must allege in pertinent part:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

….

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in the petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[8] We employ a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to

the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92-93 (Ind. Ct. App. 2014) (citations omitted). "The trial court's findings of fact are clearly erroneous if the record lacks any evidence or reasonable inferences to support them. A judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings." *In re Adoption of T.W.*, 859 N.E.2d 1215, 1217 (Ind. Ct. App. 2006) (citation omitted).

[9] Mother does not specifically challenge any of the trial court's findings, so "they must be accepted as correct." *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992). She does challenge the trial court's conclusion that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied. "To determine whether the conditions that resulted in the children's removal will not be remedied, the trial court engages in a two-step analysis." *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016).

> The court first identifies the conditions that led to removal and then determines whether there is a reasonable probability that those conditions will not be remedied. The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of

changed conditions, and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. Trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of her future behavior.

*Id.* (citations and quotation marks omitted).

[10] The Children were removed from Mother because J.D. and M.D. had been physically abused by her live-in boyfriend Coon. Mother knew that the abuse was occurring but allowed it to continue. J.D. and M.D. suffered from post-traumatic stress disorder and were in counseling for sixteen months. Pursuant to the CHINS dispositional decree, Mother was required to participate in counseling and other services and obtain suitable housing and employment. Mother made some progress in getting her act together, but she failed to gain meaningful insight into her habitual patterns of putting her needs before the Children's and getting romantically involved with domestic abusers. Indeed, the Children were removed from Mother's home a second time after they were physically abused by Zook (who by all appearances was another live-in boyfriend), yet Mother continued to maintain a relationship with him. Given this evidence, we cannot say that the trial court clearly erred in concluding that there is a reasonable probability that the conditions which resulted in the

Children's removal and continued placement outside the home will not be remedied. Therefore, we affirm.[1]

[11] Affirmed.

Najam, J., and Pyle, J., concur.

---

[1] Mother also argues that the trial court erred in concluding that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address that argument.