## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 26 2019, 8:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Heather M. Schuh-Ogle
Thomasson, Thomasson, Long
 & Guthrie, P.C.
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Benjamin M. L. Jones
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of A.M. and Au.M. (Minor Children) and E.M.-G. (Father)

E.M.-G. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 26, 2019

Court of Appeals Case No. 19A-JT-1753

Appeal from the Bartholomew Circuit Court

The Honorable Kelly Benjamin, Judge

The Honorable Heather Mollo, Magistrate

Trial Court Cause Nos. 03C01-1806-JT-3294 03C01-1806-JT-3295

**Vaidik, Chief Judge.**

# Case Summary

E.M.-G. ("Father") appeals the termination of his parental rights to his two children. We affirm.

# Facts and Procedural History

The facts that follow are taken primarily from the trial court's findings of fact, none of which Father challenges on appeal.[1] Father and V.M. ("Mother") are the biological parents of A.M., born in 2012, and Au.M., born in 2013 (collectively, "Children").[2] Father is not an American citizen and resides in the United States without proper documentation.

In March 2017, the Department of Child Services (DCS) received a report alleging that Children were the victims of neglect because Father had stabbed Mother over twenty times with a screwdriver and that Children were present during the incident. *See* Ex. 45. Father and Mother were married, and Father told police that he stabbed Mother because he believed she was having an affair. Father admits that he became angry, lost control, and stabbed Mother with a screwdriver and that Children were in the room. *See* Tr. p. 51. Father was arrested and charged with Level 3 felony attempted aggravated battery, Level 5

---

[1] Because Father does not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

[2] Mother's parental rights were also terminated, but she does not participate in this appeal; therefore, we limit our narrative to the facts relevant to Father.

felony domestic battery by means of a deadly weapon, Level 6 felony domestic battery resulting in moderate bodily injury, and Level 6 felony domestic battery committed in the presence of a child less than sixteen years old. *See* Ex. 36. Father later pled guilty to Level 5 felony domestic battery by means of a deadly weapon. He was sentenced to six years in the Department of Correction (DOC), all executed. *See* Ex. 39. As a result, Father is on an immigration hold and may be subject to deportation upon his release from incarceration.

[4] On March 29, Children were removed from Parents' care after they returned from staying with relatives in Wisconsin (it is unclear from the record why Children were in Wisconsin). The next day, DCS filed petitions alleging that Children were in need of services (CHINS). An initial hearing on the CHINS petitions was held on May 2. Parents appeared and admitted that Children were CHINS. Following the hearing, the court found that Children were CHINS and ordered that they continue to be detained. In August, following a dispositional hearing, the court ordered that Father participate in services, including a substance-abuse assessment and domestic-violence classes. The court also ordered that Father contact DCS upon his release from incarceration, abide by any and all protective orders, and update DCS if he was moved to a different facility.

[5] After they were removed, Children displayed significant behavioral and adjustment issues associated with the trauma. Children were hoarding food, waking up in the middle of the night to get food from the refrigerator, bedwetting, using inappropriate language, and acting out in destructive ways.

Children also had difficulty maintaining boundaries. Children were placed in several foster homes and showed these behaviors in each placement. At one point, A.M. was suspended from summer camp due to cursing and vulgar language. She also urinated on herself and played in the puddle of urine while at camp.

[6]     In June 2018, DCS filed petitions to terminate Father's parental rights to Children. A fact-finding hearing on the termination petitions was held in November 2018. Au.M.'s therapist Katherine Miller testified that she began working with Au.M. in May 2018 to address trauma symptoms and behavioral issues he was having. Therapist Miller said that Au.M. has been diagnosed with post-traumatic stress disorder, which causes him to fidget a lot, struggle to focus, and express a lot of anger and aggression. *See* Tr. p. 21. Therapist Miller stated that when she began working with Au.M., "he kept asking where [Father] was, and he kept asking if [Mother] was dead. Because he thought [Mother] was dead." *Id.* Therapist Miller testified that if Parents "were consistent, and they were present, and they could provide stability and support, that . . . would always be beneficial. But if that can't happen, . . . I would be very concerned." *Id.* at 23. Therapist Miller said that it is important for Au.M. to have permanency and that she believes that it is in his best interests to be adopted by his foster family. *See id.* at 24. Therapist Miller noted that Au.M. has not mentioned Father since he has been placed with his current foster family. *See id.* at 26. DCS Supervisor Susie Hodnett testified that during a September 2017 review hearing, the court discovered that Father had been

transferred to Putnamville Correctional Facility and that Father did not tell DCS about the transfer. *See id.* at 31-32. Supervisor Hodnett said that Father has also not given DCS documentation of what programs he has participated in while incarcerated. *See id.* at 35. Supervisor Hodnett believes it is in Children's best interests for the court to terminate Father's parental rights.

[7] Family Case Manager (FCM) Christine McKitrick testified that she took over the case in September 2018 and that DCS's permanency plan is for Children to be adopted by their current foster placement. *See id.* at 40. FCM McKitrick said that Father's expected release date is February 2021. FCM McKitrick stated that Children's foster family wants to adopt them and that Children have told her that they "feel safe and secure with this family." *Id.* at 41. FCM McKitrick believes that it is in Children's best interests for Father's parental rights to be terminated. Court Appointed Special Advocate (CASA) Melissa zur Loye testified that she has been Children's CASA for almost a year and a half and that in this case, permanency is "essential." *Id.* at 46. She explained, "[Children have] had six foster placements since they've c[o]me in on this case. And they had another case that was ongoing for almost two years before that, where they were in foster care." *Id.* CASA zur Loye stated that it is in Children's best interests to be adopted by their foster family. *See id.* at 48. Children's foster mom, H.M., testified that her family wants to adopt Children. *See id.* at 64. H.M. said that Children need a permanent home and that "[t]he way they talk, they want to stay in one place." *Id.* at 64.

[8]     Father testified that since he has been incarcerated, he completed a program called "CLIFF" for drug abuse and another program for anger management. *See id.* at 68. Father said he plans on doing another program for substance abuse, drugs, and alcohol and that he is planning on completing school. *See id.* Father testified that he is trying to complete enough programs to cut his sentence by a year and a half. *See id.* at 69. Regarding his immigration hold Father said, "that doesn't mean that they are going to deport me. Because first of all, I am going to keep fighting to keep my children. And as long as I have somebody, something that I am going to fight for here, they are not going to deport me." *Id.* Father stated that DCS "can take care of my kids while I am in prison." *Id.* at 70. Father also said that he is still married to Mother. *Id.* at 49. In June 2019, the court issued its order terminating Father's parental rights.

[9]     Father now appeals.

# Discussion and Decision

[10]    When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review

whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[11] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[12] Father first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be

remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of his future behavior. *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016).

[13] Here, Father fails to demonstrate that he is any closer to providing Children a safe, stable home than he was at the beginning of the CHINS case in March 2017. The trial court's unchallenged findings on this issue support its conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be remedied. That is, the trial court found:

*****

59. Father believes it to be in [Children's] best interest[s] that DCS manage their care until he is free from incarceration and free from an immigration hold.

60. Father acknowledged at trial that [Children] suffered psychological harm due to the incident on March 2, 2017. He

further acknowledged that there could be an emotional impact on the Children while they wait for his release.

61. Per the information available to DCS, FCM McKitrick has no reason to believe that Father would be released from incarceration prior to February 28, 2021.

*****

68. [CASA] does not believe it to be in [Children's] best interest[s] to wait for Father's unknown release from all custody holds.

*****

72. In addition, given the continued marriage of Mother and Father, and the concerns of unaddressed volatility between the two, the safety of [Children] and further trauma to them is a significant threat.

Appellant's App. Vol. II pp. 18-19. Nevertheless, Father claims he is like the parents in three cases where our Supreme Court reversed the termination of parental rights: *K.E. v. Indiana Department of Child Services*, 39 N.E.3d 641 (Ind. 2015); *In re J.M.*, 908 N.E.2d 191 (Ind. 2009); and *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), *reh'g denied*. In those cases, although all the parents were incarcerated during their cases, they were each incarcerated for drug-related offenses. *See K.E.*, 39 N.E.3d at 643-45 (convicted of dealing in methamphetamine, neglect of a dependent, maintaining a common nuisance); *In re J.M.*, 908 N.E.2d at 192 (attempted dealing in methamphetamine); *In re*

*G.Y.*, 904 N.E.2d at 1258-59 (convicted of dealing in cocaine). Furthermore, the parents in these cases completed numerous programs while incarcerated to better themselves.

[14] Father here is not at all like the parents in *K.E.*, *In re J.M.*, or *In re G.Y.* For starters, Father was convicted not of a drug-related offense but of felony domestic battery for stabbing Mother over twenty times with a screwdriver while Children were in the room. Moreover, Father is still married to Mother, and there is no evidence that the volatility of their relationship has been addressed. Therefore, their relationship still poses a significant threat to the safety of Children. Finally, unlike the parents in the cases cited by Father who completed multiple programs while incarcerated to better themselves, Father has completed only one program. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied.[3]

[15] Father next challenges the trial court's conclusion that termination is in Children's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d

---

[3] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Children's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (B) has been established by clear and convincing evidence), *trans. denied*.

1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that their physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.*

[16] Here, Therapist Miller, Supervisor Hodnett, FCM McKitrick, and CASA zur Loye all testified that terminating Father's parental rights is in Children's best interests. *See* Tr. pp. 24, 37, 42, 48. Furthermore, Therapist Miller and CASA zur Loye both expressed concerns if Children's permanency were delayed. *See* Tr. pp. 23, 46; *see also In re A.D.S.*, 987 N.E.2d at 1159 ("permanency is a central consideration in determining the best interests of a child"). The trial court found that given Children's past trauma, they exhibited significant behavioral and adjustment issues but have made progress in therapy. *See* Appellant's App. Vol. II pp. 17-18. Finally, the trial court found that Children reported feeling safe and secure in their foster home and that Children's foster parents want to adopt Children. *See id.* at 18; *see also In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships.").

[17] For all of these reasons, the trial court did not err when it determined that termination is in Children's best interests.

[18] Affirmed.

Najam, J., and Tavitas, J., concur.