## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 08 2020, 11:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of K.R.L.F., N.F., Kev.F., Ke.F., and Kr.F. (Minor Children) and A.F. (Mother),

A.F. (Mother),
*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

April 8, 2020

Court of Appeals Case No.
19A-JT-2165

Appeal from the
Parke Circuit Court

The Honorable
Samuel Swaim, Judge

Trial Court Cause Nos.
61C01-1904-JT-53
61C01-1904-JT-54
61C01-1904-JT-55
61C01-1904-JT-56
61C01-1904-JT-57

**Vaidik, Judge.**

# Case Summary

[1] A.F. ("Mother") appeals the termination of her parental rights to her five children. We affirm.

# Facts and Procedural History

[2] The facts that follow are taken primarily from the trial court's findings of fact, none of which Mother challenges on appeal.[1] Mother and K.F. ("Father") (collectively, "Parents") are the parents of K.R.L.F., born in 2002, N.F., born in 2014, Kev.F., born in 2015, and twins Ke.F. and Kr.F., born in 2017 (collectively, "Children").[2]

[3] On May 3, 2017, the Department of Child Services (DCS) received a report alleging that Ke.F. and Kr.F.'s meconium had tested positive for THC at birth. The next day, DCS interviewed Parents at their house. Mother was tested for drugs, and the results were later returned as positive for THC. DCS also saw that Parents' house was cluttered and dirty. DCS opened an Informal Adjustment (IA) to provide the family services, and Children remained with

---

[1] Because Mother does not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

[2] Father's parental rights were also terminated, but he does not participate in this appeal; therefore, we limit our narrative to the facts relevant to Mother.

Parents. Parents were provided a home-based case worker to help them clean and repair their house, but its conditions continued to deteriorate. There were "animal feces smashed into the carpet throughout the home." Tr. p. 31. Family Case Manager (FCM) Supervisor Amanda Holt said that the "dogs had free reign of the home and left feces all over the place" and that the family's "sleeping arrangements were difficult to view because they were just wherever the piles were not." *Id.* During the IA, Mother continued to test positive for THC.

[4] In October 2017, DCS filed petitions alleging Children to be Children in Need of Services (CHINS), claiming that Parents were not in compliance with drug screens and that the conditions of the family's house had worsened. Later that day, the trial court held an initial hearing and allowed Children to remain with Parents under an "in-home" CHINS.

[5] In December 2017, Mother twice tested positive for methamphetamine, amphetamine, and THC. By the end of December, Children were removed from Parents' care due to "poor home conditions," "ongoing concerns for drug use," and a "lack of progress through the in-home CHINS." *Id.* at 32. A detention hearing was held on January 3, 2018, and the trial court approved the removal of Children from Parents' care. The next day, one of Mother's drug screens was returned as positive for methamphetamine, amphetamine, and THC. *See* Ex. H. On January 9, the trial court held a CHINS fact-finding hearing, and Mother admitted that Children were CHINS. Later that month, following a dispositional hearing, the trial court ordered Parents to participate

in services, including drug and alcohol treatment, random drug screens, home-based case management, and supervised visitation. *See* Tr. p. 38. The trial court also ordered Mother to obtain and maintain stable and appropriate housing and employment; not use, consume, or possess illegal substances; complete a family-preservation program; complete parenting and substance-abuse assessments; and follow all recommendations that came from such assessments. *See* Ex. C.

[6] For the next year, Mother was somewhat compliant with services. She attended almost all supervised visitation with Children, but she "cusse[d] at the children throughout the visits" and refused contact with Children on weekends because she claimed that the weekend was "Mother and Father's time together." Ex. C. She also completed her substance-abuse assessment and was referred to individual therapy, motivational interviewing, and the matrix program. Mother completed her psychological evaluation and was diagnosed with bipolar disorder, cannabis-use disorder, and an unspecified anxiety disorder. It was recommended that before engaging in therapy to address her bipolar disorder, Mother work on reducing her chronic use of marijuana. *See* Tr. p. 132. Regarding the family's house, Mother refused to engage in home-based case management, and the house continued to deteriorate. For example, DCS received a report that there were "dead rats in the kitchen sink with live rats eating the dead rats." *Id.* at 46. DCS was also concerned that there was possibly mold in the house, there were "[d]og feces throughout the home due to an estimated twelve dogs in the home," and the house did not have working

utilities. *Id.* At some point, Parents moved to a house in Clinton, but they struggled to keep the new house safe and clean and, eventually, refused to allow DCS inside the home. *See* Ex. C. As for her participation in random drug screens, in October 2018, Mother submitted to eleven out of twenty-one requested drug screens. *See id.* Nine of those eleven drug screens were positive for THC. *See id.*

[7] In January 2019, the trial court suspended Mother's visits until she attended one self-help session per week, complied with drug screens, and attended all sessions for motivational interviewing (a therapy that helps individuals recognize their problems and build motivation to find solutions) and related drug and alcohol assistance programs. *See id.* In February 2019, Mother was arrested for stabbing her brother.[3] *See* Tr. p. 65. Two weeks later, Mother and Father got into an altercation. Father was suicidal at the time, and police were called to Parents' house. *See id.* at 65-66. In March, citing Mother's lack of progress and noncompliance with services, the trial court approved DCS's request to change Children's permanency plan to termination of parental rights and adoption.

[8] In April, DCS filed petitions to terminate Mother's parental rights to Children. Later that month, DCS went to Parents' house along with a new home-based case manager to try to get Mother reengaged in services. However, Mother was

---

[3] According to DCS, no charges were filed for this incident. *See* Tr. p. 78.

"extremely aggressive . . . to the point that [the DCS worker] and the [home-based] case manager ultimately just got back in [their] car and left." *Id.* at 66. In May, Mother submitted to only three out of the twenty drug screens requested by DCS. Of those three, one was later returned as positive for methamphetamine, amphetamine, and THC. *See* Ex. C. On June 17, Mother was charged with Class A misdemeanor domestic battery against Father. *See* 83C01-1906-CM-110. Allegedly, Father was trying to leave the house when Mother pulled his beard and hair and threw glass at him, cutting his hand. *See* Ex. E. Both Mother and Father were arrested and ordered to have no contact with each other.[4] *See id.*

[9] Less than two weeks later, the termination fact-finding hearing was held. Father did not appear, and although Mother did appear, she was almost two hours late to the hearing. *See* Appellant's App. Vol. II p. 92. FCM Tamyra Robinson testified that she had been the family's case manager since October 2018. FCM Robinson said that Mother told her that she could not engage in home-based case management because she was "too tired to engage in the service because of her visitations with [Children]." Tr. p. 45. FCM Robinson stated that she did not believe that Mother had "any kind of meaningful relationship with [Children]." *Id.* at 73. FCM Robinson testified that DCS's plan for Children is adoption and that all five children were in pre-adoptive

---

[4] In September 2019, Mother and the State entered into a pretrial diversion agreement.

foster homes. *Id.* at 74. FCM Robinson also stated that she did not believe that the conditions that caused the removal of Children would ever be remedied. *Id.* at 82. Regarding the allegations of domestic violence, FCM Robinson said that in November 2018, Mother told her that Father "had attempted to kill her three times, one with an ax, one with a BB gun and one with a machete." *Id.* at 61.

[10] Sarah Szerlong, a psychologist, testified that she conducted Mother's psychological evaluation and determined that Mother was suffering from bipolar disorder, cannabis-use disorder, and an unspecified anxiety disorder. *Id.* at 131. However, Szerlong said that Mother was "cognitively able to make positive choices for herself and her children" and that there was no reason to believe that Mother was not able to improve her parenting skills. *Id.* at 134. Donna Coy, a toxicologist with Forensic Fluids, testified that her lab processed forty drug screens for Mother and of those forty, twenty-four were positive for a variety of substances, including methamphetamine, THC, buprenorphine, and hydrocodone. *Id.* at 21. John Martin, a toxicologist with Redwood Toxicology, testified that his lab processed five drug screens for Mother and of those five, three were positive for THC. *Id.* at 107. Gretchen Peterson testified that she supervised visits for Mother and Children and that she was never able to resolve Mother's issue of "cuss[ing]" at Children during visits. *Id.* at 154-55. Jennifer Roach, a mental-health counselor, testified that she provided therapy to K.R.L.F., N.F., and Kev.F., who were all diagnosed with an "other specified trauma and stress related disorder." *Id.* at 114. Regarding Parents' house, Counselor Roach said that K.R.L.F. "has talked about there being animal feces

on the floor, animals dying, feeling hungry for food and having to crawl on countertops and in cabinets to find something to eat." *Id.* at 118. Counselor Roach said that K.R.L.F., N.F., and Kev.F. "need to remain outside of the home" because "they could suffer mental health related setbacks if they're placed in [Parents' home]." *Id.* at 119-20.

[11] Court Appointed Special Advocate (CASA) Director Audrey Hayman testified that she was appointed as Children's CASA in October 2017. CASA Hayman stated that she believes termination is in Children's best interests and that the conditions resulting in Children's removal had not been remedied. *See id.* at 144. CASA Hayman stated that she did not observe any changes in Mother's behavior throughout this case. *See id.* at 147. Mother testified that she recently "went to jail on domestic battery because [her] husband was beating . . . the crap out of [her] and [she] called the police." *Id.* at 91. Mother said that she planned on divorcing Father but had not yet filed. *Id.* Mother asserted that Father "tried sabotaging everything. He done everything in his power to make sure [she] lost [Children] and [she] wouldn't get them back." *Id.* at 174. Mother claimed that she could "do it with [Father] gone." *Id.* However, Mother also admitted that she was addicted to marijuana and not compliant with services. *See id.* at 95, 176. In August 2019, the trial court issued its order terminating Mother's parental rights.

[12] Mother now appeals.

# Discussion and Decision

[13]     When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[14]     A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of
> the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[15] Mother first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of her future behavior. *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016).

[16] Mother specifically argues that "she was the victim" of domestic violence and "had left Father and would be filing for divorce," and therefore that she can now remedy the conditions that resulted in Children's removal. Appellant's Br.

p. 18. First, by no means is it clear from the record that Mother was the victim of domestic violence. There is evidence showing that Father and Mother were both arrested in June 2019 for battering each other and that during the incident, Mother threw glass at Father and cut his hand. *See* Ex. E. But even if we assume that Mother was the victim of domestic violence and that she followed through on her plan to divorce Father, there is plenty of other evidence showing that she is no closer to providing Children a safe, stable home than she was at the beginning of the CHINS case in October 2017. The evidence shows that Mother did not participate in cleaning the home and did not provide for Children's needs. Therefore, the trial court found that Parents "failed to demonstrate that they could clean their residence to ensure the safety of the Children." Appellant's App. Vol. II p. 110. Mother herself admitted that she did not comply with services. Tr. p. 176. Furthermore, the evidence shows that Mother used THC and methamphetamine a month before the termination hearing and that she consistently tested positive for THC throughout the CHINS case. The trial court found that "Mother continued abusing THC on a regular basis." Appellant's App. Vol. II p. 113. Indeed, Mother even admitted that she is addicted to marijuana. *See* Tr. p. 95. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied.

[17] Mother also challenges the trial court's conclusion that termination is in Children's best interests. To determine what is in the child's best interests, the

trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59.

[18] Here, FCM Robinson and CASA Hayman both testified that terminating Mother's parental rights is in Children's best interests. *See* Tr. pp. 74, 144. The trial court also found that Mother "demonstrated repeatedly that [she] did not have a significant or meaningful relationship with the Children." Appellant's App. Vol. II p. 115. The evidence shows that Mother "cusse[d] at the children throughout the visits" and refused contact with Children on the weekends because she claimed that the weekend was "Mother and Father's time together." *See* Ex. C. Furthermore, Counselor Roach testified that the children she worked with—K.R.L.F., N.F., and Kev.F.—needed to remain outside Parents' home to ensure that their mental-health needs were met. Tr. p. 119. Indeed, Counselor Roach said that K.R.L.F. told her that when she lived with Mother, she remembered "feeling hungry for food and having to crawl on countertops and in cabinets to find something to eat." *Id.* at 118. For all of

these reasons, the trial court did not err when it found that termination is in Children's best interests.

[19] Affirmed.

May, J., and Robb, J., concur.