## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 29 2019, 7:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvonne M. Spillers
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of J.R. (Minor Child) and A.P. (Mother),

A.P. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

August 29, 2019

Court of Appeals Case No. 19A-JT-779

Appeal from the Wells Circuit Court

The Honorable Kenton W. Kiracofe, Judge

Trial Court Cause No. 90C01-1807-JT-27

**Vaidik, Chief Judge.**

# Case Summary

[1] A.P. ("Mother") appeals the termination of her parental rights to her daughter, J.R. ("Child"). We affirm.

# Facts and Procedural History

[2] Mother and J.M.R. ("Father") are the biological parents of Child, born in August 2006. Father consented to Child's adoption and does not participate in this appeal; therefore, we limit our narrative to the facts relevant to Mother.

[3] In June 2016, Mother was living with her boyfriend, B.J., in Madison County when they got into a domestic dispute that ended with B.J. pointing a gun at her head. Child was in the house at the time. Afterwards, Mother went to court to get a protective order against B.J., and the Department of Child Services (DCS) got involved due to the domestic-violence issues. Mother and DCS agreed to an informal adjustment (IA) to try to resolve the domestic-violence issues. However, Mother did not comply with the IA. That is, Mother tested positive for marijuana and did not obtain stable housing. In October, Mother told DCS that she was going to enlist in the National Guard and transfer custody of Child to someone else. Apparently taking Mother at her word, DCS closed the IA; however, there is no evidence that Mother ever enlisted or transferred custody of Child. After the IA was closed, B.J. moved back into the house with Mother and Child.

[4] Less than a year later, in March 2017, DCS received multiple reports of abuse or neglect of Child. On March 8, Family Case Manager (FCM) Kristen Beer conducted an assessment and discovered that Mother had taken Child to maternal grandmother's ("Grandmother") house in Wells County, Indiana. FCM Beer went to Grandmother's house and interviewed Child, who said that she witnessed domestic violence between Mother and B.J. Child also told FCM Beer that Mother told her "they do weed." Tr. p. 29. At the time of Child's interview, Mother was in Madison County, and FCM Beer spoke to her by phone. Mother explained that she "had been planning to come back to Wells County that evening when she could get a ride." *Id.* After speaking with Mother, DCS removed Child from Mother's care, placed Child with Grandmother, and filed a petition alleging that Child was a Child in Need of Services (CHINS).[1] The trial court determined that Child was a CHINS after Mother admitted the allegations in DCS's petition. Following the hearing, the trial court ordered that Mother participate in numerous services, including a substance-abuse assessment, a psychological assessment, home-based case management, and drug screens. The trial court also ordered Mother to contact the FCM every week and notify the FCM of "any changes in address, household composition, employment or telephone number within five (5) days of said change." Appellant's App. Vol. II p. 26. Child remained placed with Grandmother. Around that same time, in April 2017, Mother met and married

---

[1] DCS also removed Child's half-sibling, J.H, from Mother's care. In June 2018, J.H. was placed with his father, who has since been granted full physical and legal custody. *See* No. 48C01-1205-JP-186.

R.M. Three days after they were married, Mother filed for divorce from R.M. because of domestic violence. *See* Tr. p. 120.

[5] In May 2017, DCS removed Child from Grandmother's care because adults living in Grandmother's house tested positive for marijuana. Child was then placed in foster care. Meanwhile, Mother began dating R.S. and stopped contacting DCS.

[6] In June, Child was placed in relative placement with paternal aunt (Aunt). Child's therapist, Kristen Keuhl, worked with Child during the transition and found that Child was showing signs of significant anxiety—panic attacks, chest pains, crying spells, sleep problems—the day before, the day of, or the day after visitation with Mother. *See id.* at 91. Keuhl recommended that Child's visits with Mother be suspended until Child learned how to relax and cope with her feelings of anxiety and distress.

[7] In mid-August 2017, Mother reconnected with DCS and began engaging in some services. She completed a substance-abuse assessment, which recommended that Mother undergo individual substance-abuse counseling, group counseling, and submit to random drug screens. When Mother began individual substance-abuse counseling, she agreed to abstain from alcohol, among other things. Mother also completed some drug screens but failed to complete others, and on August 15 tested positive for marijuana. By September, Child had improved her ability to manage her anxiety and began having supervised therapeutic visitation with Mother. Around this same time,

Mother broke up with R.S. "due to his consistent substance use" and because she wanted to "do what's best for [Child]." Tr. p. 64. Two months later, however, Mother reunited with R.S., and they married in December 2017.

[8] For a time, Mother remained somewhat engaged in drug screens and visits with Child. Then, in March 2018, she had two positive drug screens; that is, on March 1 and 15, she tested positive for alcohol despite having previously agreed not to consume alcohol. In mid-March, Mother stopped DCS services altogether. First, Mother missed a special full-day visit with Child and some of her extended family. Mother did not call to explain her absence and then missed her next three visits with Child. Mother also started missing appointments at Park Center, where she was completing individual and group substance-abuse counseling. From mid-March to August 2018, Mother's whereabouts were unknown, and DCS was unable to locate her. When Mother first went missing, Child was "fearful of where Mother was at . . . but then became complacent," telling DCS workers that Mother "has a history and routine of leaving and coming back." *Id.* at 57. Later, DCS discovered that Mother and R.S. had left Indiana and moved to Florida at the end of March. In July, DCS filed a petition to terminate Mother's parental rights to Child.

[9] On August 3, Mother returned to Indiana to address a bench warrant that was issued after she failed to appear for Child's April 16 permanency hearing. On August 19, after Mother was baptized in the Pentecostal Church, she turned herself in. Mother was released on her own recognizance, but a condition of her release was to contact DCS and speak with the FCM. After reconnecting

with FCM Lindsey Timmons, Mother began attending home-based case management and submitted to drug screens.

[10] In December, the trial court held a fact-finding hearing on the termination petition. FCM Beer testified that when Child was removed from Mother's care, she was concerned that there were several instances where Mother would leave Child with Grandmother because the domestic violence with B.J. had been "going on for over a year." *Id.* at 44. FCM Timmons testified that when she took over the CHINS case, Mother was complying with services until July 2017, when Mother's phone changed and "her whereabouts were unknown." *Id.* at 48. FCM Timmons said that Mother reconnected with DCS in late August or early September 2017, but then went missing again from March to August 2018. *See id.* FCM Timmons stated that since March 2017, Mother has had "nine separate households." *Id.* at 49. FCM Timmons said that Mother never told her when someone moved in or out of her house and did not tell her when she was married or divorced. FCM Timmons stated that Mother's failure to disclose her marital history was a concern for DCS because "it continues to show instability." *Id.* Aside from FCM Timmons's concern about Mother's instability, she testified that throughout the CHINS case Mother "has not called or not showed-[up] for over a hundred and twenty drug screens." *Id.* at 53. FCM Timmons also confirmed that Mother's most recent drug screen was positive for methamphetamine and stated that Mother's husband, R.S., had also been ordered to take drug screens and "almost every drug screen – was positive for an illegal substance." *Id.* at 51. FCM Timmons stated that she believed that

termination of Mother's parental rights is in Child's best interests because Child "had to overcome severe anxiety, depression, night tremors . . . and has maintained consistent . . . bonds with the family [Child is] with now." *Id.* at 60. Regarding DCS's plan for Child, FCM Timmons said the plan is adoption and that Aunt is willing to adopt Child.

[11] Child's therapist, Kristen Keuhl, testified that when she first started working with Child, she was having "panic attacks, crying spells" and at one point had to be "taken to the emergency room for chest pains." *Id.* at 84. Keuhl believed that the instability in Child's life had been significant and caused Child to have difficulties maintaining relationships with caregivers, particularly female caregivers. Keuhl said that by the end of her treatment with Child in May 2018, Child "no longer wanted to be reunified with [Mother]." *Id.* at 93. Child's Guardian ad Litem (GAL), Beth Webber, testified that Mother had "moved around and demonstrated huge instability." *Id.* at 97. The GAL stated that Mother did not complete services, specifically individual and group counseling, and did not obtain stable housing. Ultimately, the GAL said, "I whole-heartedly believe that termination of parental rights and subsequent adoption is in the best interests of [Child]." *Id.* at 100. Mother also testified that in March 2017, it was her intention to have Child stay with Grandmother for a few days so that she could "obtain our property" from the house she shared with B.J. *Id.* at 114. Mother also explained that in March 2018 when she went to Florida with R.S., it was for her to "take a breath and make sure

[she] was okay to make sure [Child] [is] okay." *Id.* at 121. In March 2019, the trial court issued its order terminating Mother's parental rights.

Mother now appeals.

# Discussion and Decision

Mother contends that the evidence is insufficient to support the trial court's order terminating her parental rights to Child. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:

> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[15] Mother first argues that there is insufficient evidence to support the trial court's conclusion that the conditions resulting in Child's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before

termination, and the court may find that a parent's past behavior is the best predictor of his future behavior. *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016).

[16] Here, Mother failed to demonstrate that she was any closer to providing Child a safe, stable home than she was at the beginning of the CHINS case. The trial court's unchallenged findings on this issue support its conclusion that the conditions resulting in Child's removal will not be remedied. *See, e.g., In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (findings regarding father's non-compliance with services support trial court's conclusion that conditions resulting in children's removal from father's care would not be remedied). That is, the trial court found that Mother had lived in nine different households during the CHINS case and did not notify DCS of her household composition, marriages, or divorces. *See* Appellant's App. Vol. II p. 40 (Findings 18, 20). The trial court also found that Mother failed to call in to see if she needed to take a drug screen more than 120 times and did not complete substance-abuse services.[2] *See id.* at 40-41 (Findings 22, 23). Finally, the trial court found that twice during the CHINS case, Mother's whereabouts were unknown because Mother moved without notifying DCS. *See id.* at 41 (Finding 24). To the extent Mother recently began engaging in services after being baptized into the

---

[2] In arguing that the conditions resulting in Child's removal will not be remedied, the State directs us to evidence that Mother tested positive for methamphetamine on October 31, 2018. Appellee's Br. p. 18. However, Mother testified that she has never used meth and that the positive test was erroneous, *see* Tr. p. 126, and the trial court did not make a finding that Mother used meth.

Pentecostal Church, we are hopeful that she has begun to turn her life around; however, the trial court was well within its discretion to disregard the efforts Mother made only shortly before termination and to weigh more heavily her history of conduct. *See In re K.T.K.*, 989 N.E.2d at 1234. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside the home will not be remedied.[3]

[17] Next, Mother challenges the trial court's conclusion that termination is in Child's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.*

---

[3] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (B) has been established by clear and convincing evidence), *trans. denied*.

[18] Here, in addition to the domestic-violence and substance-abuse issues that necessitated DCS involvement and Mother's lack of progress since then, both FCM Timmons and the GAL testified that terminating Mother's parental rights would serve the best interests of Child. *See* Tr. pp. 60, 100. Furthermore, Child's therapist testified, and the trial court found, that Child exhibits behaviors consistent with having suffered past trauma. That is, Child suffered from "panic attacks, crying spells" and at one point had to be "taken to the emergency room for chest pains." *Id.* at 84. Finally, the trial court concluded that "Mother has had nearly twenty-one (21) months to accomplish the steps necessary to have [Child] returned to her care," and "[Child] cannot wait indefinitely for [Mother] to work toward preservation and reunification." Appellant's App. Vol. II p. 43; *see In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships"); *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them). For all of these reasons, we find that the trial court did not err when it determined that termination is in Child's best interests.

[19] Affirmed.

Riley, J., and Bradford, J., concur.