## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 07 2020, 8:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Roberta L. Renbarger | Curtis T. Hill, Jr. |
| Fort Wayne, Indiana | Attorney General |
| | Abigail R. Recker |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of K.K. (Minor Child) and M.K. (Father) | August 7, 2020 |
| | Court of Appeals Case No. 20A-JT-194 |
| M.K. (Father), | |
| *Appellant-Respondent,* | Appeal from the Allen Superior Court |
| v. | The Honorable Charles F. Pratt, Judge |
| Indiana Department of Child Services, | The Honorable Sherry A. Hartzler, Magistrate |
| *Appellee-Petitioner* | Trial Court Cause No. 02D08-1812-JT-443 |

**Vaidik, Judge.**

# Case Summary

[1] M.K. ("Father") appeals the termination of his parental rights to K.K. ("Child"). We affirm.

# Facts and Procedural History

[2] The facts that follow are taken primarily from the trial court's findings of fact, none of which Father challenges on appeal.[1] Father and L.M. ("Mother") (collectively, "Parents") are the biological parents of Child, born in 2013. Mother's parental rights were also terminated; however, she does not participate in this appeal and therefore we limit our narrative to the facts relevant to Father.

[3] On March 15, 2015, the Department of Child Services (DCS) received a report that Father and Child were being evicted from their house and that there were ongoing medical issues with Child. Family Case Manager (FCM) Sarah Corley was assigned to conduct an assessment and spoke to Father, who said that he was being evicted and that Child was staying at his mother's ("Grandmother") house. *See* Tr. Vol. II pp. 149-50. Father stated that Child had been staying at Grandmother's house for "approximately two weeks." *Id.* at 150. During that time, Child was "sick with a virus and [had been] in and out of the hospital."

---

[1] Because Father does not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

*Id.* FCM Corley asked Father about drug use, and he responded that "he does not use drugs but he does smoke marijuana every once in a while." *Id.* at 152. FCM Corley had Father take a drug screen, which later returned positive for marijuana. DCS received authorization to remove Child and formally place her in Grandmother's care. *See id.* at 150.

[4] In April, DCS filed a petition alleging that Child was a Child in Need of Services (CHINS). On April 15, an initial hearing on the CHINS petition was held, and Father denied the allegations. Then, on May 11, DCS filed an amended CHINS petition, adding an allegation that Father had smoked marijuana at a party in March 2015. An initial hearing on the amended petition was held, and Father admitted that Child was a CHINS. That same day, the court proceeded to a dispositional hearing and ordered Father to participate in services, including completing a "Diagnostic Assessment" and a substance-abuse assessment, home-based case management, random drug screens, and supervised visitation. Ex. 6.

[5] For the next year, Father did not participate in services. In May 2016, he completed a substance-abuse assessment. It was recommended that Father be referred for substance-abuse treatment if he tested positive for drugs. Thereafter, Father tested positive for marijuana "several times" and was referred for substance-abuse treatment. Tr. Vol. II p. 183. However, Father was "adamant [that] he was not going to do substance abuse treatment." *Id.* After that, Father stopped maintaining contact with DCS and did not participate in services until the trial court changed Child's permanency plan from reunification to

termination in December 2018. At that point, despite having the court's authorization to file a termination petition, DCS re-referred Father to various service providers.

[6] In April 2019, DCS filed a petition to terminate Father's parental rights to Child. While the termination petition was pending, Father participated in some services, but by the beginning of September he had, once again, stopped participating in services and had no-showed multiple visits with Child.

[7] On September 23, 2019, the termination fact-finding hearing began. Father did not appear. Mother, who by then had moved to Georgia and indicated that she would sign a consent to Child's adoption, appeared telephonically. *See* Tr. Vol. II pp. 5-6. Addictions Counselor Paul Bruns testified that he received a referral to complete Father's substance-abuse assessment in February 2019. Bruns said that following the assessment, he worked with Father for ten weeks in individual sessions to establish "boundaries against cannabis which was [Father's] drug of choice." *Id.* at 35. Bruns stated that Father was discharged successfully for completing ten weeks of drug screens (which were all negative) and for attending individual sessions on a regular basis. *See id.* Bruns explained, however, that Father told him several times that his long-term plan was not to abstain from marijuana. *See id.* at 38. Bruns said that he had concerns about Father using marijuana going forward and did not believe that Father benefitted from the services he provided. *See id.* Bruns testified that Father did not take his individual sessions seriously and was "very adversarial and very rejecting of any kind of advice and counsel about how to proceed with his life." *Id.* at 40.

Dr. David Lombard testified that he received a referral to complete a psychological assessment of Father in August 2019. Dr. Lombard said that Father disclosed that he had "a history of conflicts" that "get escalated quite quickly . . . when the environment throws something at him that is unexpected or he doesn't like." *Id.* at 15. Dr. Lombard stated that he recommended that Father continue with substance-abuse treatment and engage in individual counseling to "consider looking at his pattern of volatility with relationships and [his] quickness to anger and see if there's ways to improve that." *Id.* at 15-16. Dr. Lombard explained that Father's strong reactions were "really kind of bordering on this could be harmful to children but it's not enough that [he] made a specific recommendation to get parenting training or something like that." *Id.* at 27.

Therapist Melissa Collingsworth testified that she received a referral to provide family therapy for Father and Child in July 2019. Therapist Collingsworth said that she provided one family-therapy session for Father and Child at the end of August, but since then, Father had "no showed" three scheduled sessions. *Id.* at 74. Therapist Collingsworth said that at the family-therapy session she facilitated, Child cried and "was angry about a previous home visit where [Father] had fallen asleep." *Id.* at 76. Therapist Collingsworth also stated that Child was afraid that Grandmother "would die" if Father and Grandmother kept arguing. *Id.* Therapist Collingsworth said that Father's response to Child crying was to yell back and "curse a lot," and that this type of reaction negatively impacted Father's relationship with Child. *Id.* at 77. Case manager

Aretha Green testified that she received a referral to provide supervised visitation for Father in April 2019. Green said that from the end of April until the first week of September, Father regularly attended visits but then "discontinued communication with [her]." *Id.* at 80. Green stated that since then, Father had missed three visits in a row and had been discharged from her services. *See id.* at 82. Green said that she reached out to Father, sending him a text message each week, but that she had not heard back from him. *See id.* at 81-82. Green also testified that she was present at a child-family team meeting in June 2019, where Father became "very upset," was "yelling using profanity," and eventually just "flat out" left the meeting. *Id.* at 85-86.

[10]     Therapist Paige Zehr testified that she received a referral to provide individual therapy to Child in June 2019. Therapist Zehr said that she diagnosed Child as having an adjustment disorder and was working on trying to determine whether Child also had an oppositional-defiant disorder. *Id.* at 56-57. Therapist Zehr stated that Child told her that visits with Father "don't go well that he never does anything with her that he yells at her [and] that he's cussed at her." *Id.* at 57. Therapist Zehr testified that Child "needs a lot of support" and stability and that she recommended Child continue in her current placement with Grandmother. *Id.* at 58. Grandmother testified that although Child was formally placed with her in April 2015, "before that [Child] was with [her] probably 90 percent of the time." *Id.* at 89. Grandmother said that if Father's parental rights were terminated, she wanted to adopt Child. *See id.* at 90. Grandmother had concerns with Father's ability to care for Child because of

"[h]is anger issues his ups and downs and his being able to provide." *Id.* Regarding Father's ability to provide, Grandmother said that Father had a history of asking her for money or food and that he had done this as recently as the day before the termination hearing. As for Father's anger issues, Grandmother explained that when Father is angry, he acts "[o]ut of control," "[s]creaming hollering getting in your face," and uses vulgar language. *Id.* at 96, 104. After Grandmother finished testifying, the trial court continued the termination hearing.

[11] The next day, September 24, the termination hearing resumed. Once again, Father failed to appear. FCM Corley testified that DCS removed Child from Father's care "because of the eviction and medical issues." FCM Corley said that DCS removed Child and placed her with Grandmother "to ensure that [Child] was safe and continue[d] to have [] proper medical care." *Id.* at 156. FCM Ziaria Thomas testified that she was the family's case manager from May 2016 to May 2019. FCM Thomas said that during that time Father "was up and down . . . with his services." *Id.* at 166. FCM Thomas explained that initially "[Father] was not doing any services but [he] was willing to communicate with [DCS] and then [Father] would fall off the face of the earth and [DCS] wouldn't hear from [Father] and then [Father] would either reach out or say no one has spoke[n] to him." *Id.* at 166. FCM Thomas stated that "towards the tail end" of her time as the family's case manager, Father made some progress in services. *Id.* at 180. FCM Thomas said that "once the permanency plan was switched to change of custody or TPR with adoption that kind of lit a fire under [Father]

and [he] was willing to be more engaged." *Id.* FCM Thomas testified that, for example, Father initially "was adamant that he wasn't going to do any other services or dance around like a puppet for [DCS] is what he would often say." *Id.* at 183. FCM Thomas said that then, "finally when we got to that TPR . . . [Father] was willing to do another substance abuse assessment willing to do drug screens and willing to do substance abuse treatment." *Id.* FCM Thomas also stated that although Father participated in visits, there was "often cussing and yelling," so "they may not have been purposeful or meaningful visits." *Id.* at 185.

[12] At the end of the second day of the termination hearing, after Mother changed her mind about consenting to Child's adoption and the parties requested additional time to present evidence as to her, the trial court engaged in the following colloquy with Father's attorney:

> Court: --okay so this is the—this is the Court's order . . . we'll reconvene at 2 o'clock on October the 1st 2019 thank you.
>
> *****
>
> Court: And [Father's attorney] you have contact with your client?
>
> [Father's attorney]: I have a telephone number.
>
> Court: Okay you['ll] let him know about the October 1st date?
>
> [Father's attorney]: Yes.

Court: Okay.

[FCM Joshua Meyer]: I can text him too he probably won't respond but I can contact him too.

Court: All right [Father's attorney] if you would let your client know [FCM Meyer will] send a text but outside of that given the short amount of time I think that is best as we can do for notice do we agree?

[Father's attorney]: Yes.

*Id.* at 202-03.

[13] On October 1, the termination hearing resumed. Once again, Father did not appear. Before the parties began presenting evidence, Father's attorney told the trial court that she had filed a "motion to reschedule" "because [she] didn't get a hold of [Father] until—[she] tried earlier but didn't get a hold of him until yesterday." *Id.* at 204. Father's attorney asserted that Father had started a new job and that he would lose his job if he took a day off. Father's attorney asked that the trial court reschedule "to get the requisite 10-days' notice." *Id.* The court explained:

> [T]he issue here is that we've had two days of trial and [Father's] failed to appear on both days this hearing was scheduled at the request of parents' counsel to provide additional time to get this matter done. . . . The Motion to Continue is denied and we're going to go forward.

*Id.* at 208.

[14]     Mother testified that her and Father "had a very violent relationship." *Id.* at 225. Mother said that she agreed with the substance-abuse counselors "that [Father] will use after the CHINS case is closed . . . because [she had] watched [Father] smoke weed in front of [Child]." *Id.* at 229. Mother stated that she felt to remove Child "from [Grandmother] would be extremely un-beneficial." *Id.* at 236. Mother explained that Child had been with Grandmother for the "past four years a structure that she knows people that she knows and she loves and she's very comfortable with," and that removing "her from that to put her in a whole different world . . . that would hurt her more than anything." *Id.*

[15]     FCM Meyer testified that he took over the case in May 2019. FCM Meyer said the last time he had contact with Father was on July 25, 2019, and that since then, he had tried to contact Father "seven times" and Father "hasn't returned any calls," voicemails, or texts. *Id.* at 241. FCM Meyer stated that the last visit Father had with Child was in early September 2019 and that since then, Father had been discharged from his visitation supervisor "after not showing [for] three straight visits." *Id.* at 243. FCM Meyer testified that DCS's plan was for Child to be adopted by Grandmother and that he agreed with this plan because Child had been with Grandmother "over half of her life . . . [and] that's all she really knows." *Id.* at 248. Guardian ad litem (GAL) Michael Harmeyer testified that he was appointed to serve as Child's GAL in May 2015. GAL Harmeyer believed that it is in Child's best interests for the court to terminate Father's parental rights. GAL Harmeyer explained that he had concerns with Father's financial instability and that Child's best interests are served "by a continuation

of the stability that she's found in the home of [Grandmother] over the last four years." Tr. Vol. III p. 26. In December 2019, the trial court issued its order terminating Father's parental rights.

Father now appeals.

# Discussion and Decision

Father makes two arguments on appeal. First, Father argues that his due-process rights were violated when he did not receive ten-day written notice that the third day of the termination hearing had been scheduled for October 1. Second, he contends that the evidence is insufficient to support the trial court's order terminating his parental rights to Child.

# I. Due Process

First, Father argues that his "due process rights to notice and an opportunity to defend himself, were violated by the actions of the Court, in rescheduling the hearing date, at the late date of September 24, 2019, and not requiring DCS to provide written notice of the rescheduled date to Father." Appellant's Br. p. 14.

When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). Due-process in parental-rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest

supporting use of the challenged procedure. *Id.* There is no doubt that Father's private interest in his parental relationship with Child is substantial. *See id.* Likewise, the government's countervailing interest in protecting the welfare of children is also substantial. *See id.* Therefore, our task is to determine the risk of error created by the trial court's chosen method as to notice for the third day of the termination hearing.

[20] Here, it is undisputed that Father received notice of the first two days of the termination hearing, September 23 and 24, yet chose not to appear. On the second day of the termination hearing, September 24, the trial court scheduled a third day of the termination hearing for October 1, after Mother changed her mind about consenting to adoption and the parties requested additional time to complete the matter. Father's attorney agreed to October 1 and told the trial court that she would contact Father, given the short amount of time. *See* Tr. Vol. II pp. 202-03. Despite earlier attempts, Father's attorney was not able to get in contact with Father until the day before the termination hearing was set to resume. First, although notice was not given ten days before and was not in written form, Father did have notice of the third day of the hearing. Next, it is undisputed that Father failed to appear for the first two days of the termination hearing, despite having statutorily adequate notice. Third, Father's attorney accepted October 1 as the date for the third day of the termination hearing. Finally, Father was represented by counsel throughout all three days of the termination hearing, during which his attorney cross-examined witnesses and objected to the admission of evidence. For all of these reasons, we find that the

risk of error created by the trial court's chosen method as to notice was minimal.

# II. Sufficiency

[21] Next, Father contends that the evidence is insufficient to support the trial court's order terminating his parental rights to Child. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[22] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[23] Father challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. In determining whether such a probability exists, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is substantial probability of future neglect or deprivation." *Id.* The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of their future behavior. *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016).

[24] Here, even after four-and-a-half-years, Father has failed to demonstrate that he was any closer to providing Child a safe, stable home than he was at the beginning of the CHINS case in March 2015. The trial court's unchallenged findings on this issue support its conclusion that there is a reasonable probability that the conditions resulting in Child's removal and retention in foster care will not be remedied. *See, e.g.*, *In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (findings regarding father's non-compliance with services supported trial court's conclusion that conditions resulting in children's removal from father's care would not be remedied). That is, the trial court found:

> 23. [T]hat Father did not maintain contact with [DCS] and would not submit to drug screens with the case manager, again engaging in manipulation and confrontation, rather than engage in reunification or rehabilitative services.
>
> *****
>
> 35. [T]hat it was not until the Court approved a plan for termination of parental rights, that Father made any indication that he would participate in services. However, even upon his participation, it appeared that he refused to appropriately engage and therefore did not benefit. Further efforts were put into place such as family therapy, for which Father failed to follow through.

Appellant's App. Vol. II pp. 13, 15. Moreover, the trial court found that Father routinely asks Grandmother for help with money or food. *Id.* at 14 (Finding 28). Accordingly, the trial court did not err when it concluded that there is a

reasonable probability that the conditions resulting in Child's removal and continued placement outside the home will not be remedied.[2]

[25] Affirmed.

May, J., and Robb, J., concur.

---

[2] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, we need not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (B) has been established by clear and convincing evidence), *trans. denied*.